**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------x

KEISHA FOSTER, et al.,

                                 Plaintiffs,

               -against-

                                             Case No.: 14-cv-4142 (PGG)

THE CITY OF NEW YORK,

                               Defendant.

-------------------------------------------------------------------------x

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A FINDING THAT PLAINTIFFS ARE SIMILARLY SITUATED

JACKSON LEWIS P.C.
666 Third Avenue, 29th Floor
New York, New York 10017
(212) 545-4000

Attorneys of Record:
Felice B. Ekelman, Esq.

*ATTORNEYS FOR DEFENDANT*

## <u>TABLE OF CONTENTS</u>

<u>Pages</u>

TABLE OF AUTHORITIES ................................................................................... iii

PRELIMINARY STATEMENT ................................................................................1

SUMMARY JUDGMENT AND CLARIFICATION ....................................................3

FACTUAL BACKGROUND ....................................................................................5

    I.    The City's Time And Attendance Policies And Practices........................5

        A.  The CityTime System .................................................................5

        B.  Scheduling Policies ....................................................................6

        C.  Overtime Procedure And Payments To Plaintiffs .........................7

        D.  The City Paid Overtime To Plaintiffs ..........................................8

    II.   Plaintiffs' Testified That Their Claims For Overtime Depend Entirely
        On Their Individual Circumstances ........................................................9

LEGAL STANDARD..............................................................................................13

    I.    The City's Time And Attendance Policies And Practices......................15

        A.  The City's Automatic Deduction Policy Is Lawful ......................15

        B.  The City's Policy Of Paving By Schedule And Requiring
            Pre-Approval Of Overtime Is Lawful ........................................17

    II.   Plaintiffs' Legal Claims Are Not Susceptible To Collective Treatment ..............19

        A.  The Employment Settings Are Disparate.....................................19

        B.  The Compensation Of Alleged Work Performed During Pre Shift
            Hours, Meal Periods, Or Post Shift Hours Is Individualized, Highly
            Fact Specific, And Subject To Individualized Defenses .............23

        C.  Plaintiffs Fail To Properly Address Notions Of Fairness And
            Procedural Considerations And, Consequently, Fail to Meet The
            Burden Of Establishing They Are Similarly Situated...................27

i

III.    Plaintiffs Incorrectly Rely Upon *Briceno*, *Ayers,* And *Pefanis* ............................29

CONCLUSION.................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Ayers v. SGS Control Services
  2007 US Dist. LEXIS 19634 (S.D.N.Y. Feb. 27, 2007)....................................................29, 30

Briceno v. USI Services Group
  2015 U.S. Dist. LEXIS 132185 (E.D.N.Y. Sep. 29, 2015).....................................................29

Brown v. Barnes & Noble, Inc.,
  252 F. Supp. 3d 255 (S.D.N.Y. 2017)...................................................................................13

Brown v. Barnes & Noble, Inc.,
  2018 U.S. Dist. LEXIS 106098 (S.D.N.Y. June 25, 2018)....................................................14

DeSilva v. N. Shore-Long Island Jewish Health System,
  27 F. Supp. 3d 313 (E.D.N.Y. 2014) ............................................................................. *passim*

Diaz v. Elecs. Boutique of Am., Inc.,
  2005 U.S. Dist. LEXIS 30382 (W.D.N.Y. Oct. 13, 2005).....................................................15

Fengler v. Crouse Health Found., Inc.,
  595 F. Supp. 2d 189 (N.D.N.Y. 2009).................................................................................16

Gordon v. Kaleida Health,
  299 F.R.D. 380 (W.D.N.Y. 2014)..........................................................................16, 23, 25

Hertz v. Woodbury Cty.,
  566 F. 3d 775 (8th Cir. 2009) ............................................................................................24

Hinterberger v. Catholic Health Sys.,
  299 F.R.D. 22 (W.D.N.Y. 2014)................................................................................... *passim*

King v. CVS/Caremark Corp.,
  2008 U.S. Dist. LEXIS 108614 (S.D. Fla. Sept. 11, 2008) ..................................................21

Kuebel v. Black & Decker, Inc.,
  643 F. 3d 352 (2d Cir. 2011)..............................................................................................23

Lynch v. City of N.Y.,
  2017 U.S. Dist. LEXIS 178855 (S.D.N.Y. Oct. 27, 2017) .............................................17, 29

Mendez v. U.S. Nonwovens Corp.,
  314 F.R.D. 30 (E.D.N.Y. 2016).......................................................................................16, 18

Morano v. Intercontinental Capital Grp., Inc.,
    2012 U.S. Dist. LEXIS 100830 (S.D.N.Y. July 17, 2012) .....................................................20

Myers v. Hertz Corp.,
    624 F.3d 537 (2d Cir. 2010)....................................................................................13, 14

Newton v. City of Henderson,
    47 F. 3d 746 (6th Cir. 2012) ...........................................................................................24

Pefanis v. Westway Diner
    2010 U.S. Dist. LEXIS 93180 (S.D.N.Y. Sep. 7, 2010) ...........................................30

Reich v. S.New.Eng. Tel. Corp.,
    121 F.3d 58 (2d Cir. 1997)..............................................................................................24

Ruiz v. Citibank, N.A.,
    93 F. Supp. 3d 279 (S.D.N.Y. 2015)...........................................................................17, 20

Seward v. IBM,
    2012 U.S. Dist. LEXIS 49688 (S.D.N.Y. 2012) ............................................... *passim*

Thind v. Healthfirst Mgmt. Servs., LLC,
    2016 U.S. Dist. LEXIS 170503 (S.D.N.Y. Dec. 9, 2016) .......................................20

Trinidad v. Pret A Manger,
    962 F. Supp. 2d 545 (S.D.N.Y. 2013)..........................................................................14

Wolman v. Catholic Health Sys. of Long Island, Inc.,
    853 F. Supp. 2d 290 (E.D.N.Y. 2012) ..............................................................16, 25

Zavala v. Wal-Mart Stores Inc.,
    691 F.3d 527 (3d Cir. 2012)...........................................................................14, 15, 19

Zivali v. AT&T Mobility,
    784 F. Supp. 2d 456 (S.D.N.Y. 2011)..............................................................ii *passim*

**Statutes**

29 U.S.C. § 216(b) ..................................................................................................13, 15

FLSA..................................................................................................................... *passim*

**Other Authorities**

Fed. R. Civ. P. 23 ...........................................................................................................25

Local Rule 56.1 ..................................................................................................................5

## PRELIMINARY STATEMENT

Approximately 1,200 current or former Child Protective Specialists ("CPS"), Child Protective Specialist Supervisor Is ("CPSS I"), and Child Protective Specialist Supervisor IIs ("CPSS II") (collectively "Plaintiffs") employed by the City's Administration for Children's Services (the "City," "ACS" "Defendant") allege the City failed to pay overtime wages in accordance with the Fair Labor Standards Act, 29 U.S.C. § 201, et seq. ("FLSA") for time they allegedly worked but did not request pay through Defendant's established procedure which, when properly followed, resulted in approval of 99.6% of the 542,304 overtime requests and payment of more than $36 million over a 5 year period. Plaintiffs seek a finding that these 1,200 individuals who worked at 27 separate locations under hundreds of different supervisors are similarly situated to one another. In so doing, Plaintiffs ask this Court to adopt their proposed trial plan, which contemplates proceeding as a collective action, where 32 of the 42 deposed Plaintiffs (i.e., 2.5% of the opt-ins) would act as representatives for the remainder of the Plaintiffs. Plaintiffs also request the Court to find that CPSS IIs[1] – individuals who evaluate and approve overtime requests by the subordinate CPS and CPSS I positions – are similarly situated to the very same CPS and CPSS I Plaintiffs who allege the City failed to pay overtime. Plaintiffs argue that any jury verdict issued with regard to these 32 Plaintiffs should apply to all Plaintiffs.

Such an approach presupposes that all Plaintiffs are sufficiently similar to conclude, as a matter of law, that if one Plaintiff prevails on the claims, all Plaintiffs must necessarily prevail on those same grounds. To proceed on a representative basis, however, an unlawful policy must apply equally to all Plaintiffs. There is none here. Plaintiffs identify 3 lawful policies—(i) the citywide timekeeping system, CityTime; (ii) the automatic 1-hour daily meal break deduction; and (iii) the overtime

---

[1] The 42 Plaintiffs deposed identified 37 CPS IIs (also Plaintiffs) as individuals with knowledge of overtime work without compensation and/or who deviated from City policy and procedure.

1

preapproval policy—and point to disparate decisions made by certain Plaintiffs and supervisors which allegedly give rise to overtime liability. Liability is neither automatic nor consistent; rather, individual decisions, not an unlawful common policy, are the source of all theoretical liability in this matter.

The 42 deposed Plaintiffs' testimony cements reality. These Plaintiffs consistently testified that work circumstances changed throughout the limitations period based on factors specific to them, such as supervisors, work location, work unit, work duties, work schedule and personal circumstances outside of work. These unique circumstances dictated whether Plaintiffs performed any work without pay and whether Defendant was aware that such work was performed. Indeed, the Court recognized in its opinions that some Plaintiffs were not owed any overtime and received compensation for all hours worked. For example, Plaintiff Jessica Gonzalez testified she generally takes her 1 hour lunch; when she works through lunch, she submits an overtime authorization and receives compensation; if she works pre-shift or post-shift, she submits an overtime authorization and receives compensation; and that she never worked pre-shift, during lunch, or post-shift without receiving compensation for that work. How can the testimony of 42 Plaintiffs apply to a group of 1,200 individuals when a determination of liability for each Plaintiff requires an in-depth individual analysis? In short, it cannot.

This Court already acknowledged such in its June 18, 2018 Order, explaining that summary judgment was limited to only "some" Plaintiffs who demonstrated that they performed uncompensated overtime work of which Defendant had actual or constructive knowledge. "Conflicting evidence in the record" precluded such a finding for all Plaintiffs. It is plain that Plaintiffs' claims for unpaid time hinge entirely on choices made by individuals. No liability can be imposed without analyzing the circumstances pertaining to each individual Plaintiff. Accordingly, Plaintiffs are not similarly situated as a matter of law, and each Plaintiff must put forth individualized proof to support his or her claims.

## SUMMARY JUDGMENT AND CLARIFICATION

On September 30, 2017, the Court granted, in part, certain unidentified Plaintiffs' motion for summary judgment. (Dkt. 153). The detailed opinion includes an analysis of the disparate circumstances surrounding the claims of a number of Plaintiffs. (Id., 11-14). The Court engaged in a fact-intensive analysis of the City's purported knowledge of uncompensated overtime worked by certain Plaintiffs. (Id., 14-17). Therein, the Court analyzed individualized testimony of certain Plaintiffs, their varied timekeeping practices, and specific alleged statements made by supervisors (some of whom are Plaintiffs in this action) regarding timekeeping practices. (Id.)

In granting summary judgment to certain unidentified Plaintiffs, this Court held "there is ample evidence that City managers were aware that Plaintiffs were working during their unpaid lunch hour, and before or after their shifts, and were not receiving overtime compensation for this work." (Dkt. 153, p. 47). In so doing, the Court relied upon individualized testimony of Plaintiffs regarding their managers' personal knowledge of Plaintiffs working off-the-clock. (Id., 42-44).

On June 18, 2018, the Court issued another detailed opinion, denying Defendants' Motion for Interlocutory Appeal, that further explained its summary judgment decision: "this Court [...] granted in part Plaintiffs' motion for summary judgment, holding that [...] the City violated the FLSA by failing to compensate *certain Plaintiffs* for time it suffered or permitted them to work before and after scheduled shifts, and during their unpaid lunch periods[.]" (Dkt. 180, p. 4) (emphasis added). The Court reiterated summary judgment was only granted to certain unidentified Plaintiffs:

there were, in fact, plaintiffs who had demonstrated...that they had worked uncompensated overtime with the knowledge of their supervisors. And there were plaintiffs who gave testimony, offered evidence that in my view was unrebutted...I recognize that there are plaintiffs who gave much more muddled testimony, and gave testimony that in some instances supported the [C]ity's view. But the consequences of that were merely that as to those plaintiffs there may well be material issues of fact, but there were a certain number of plaintiffs about which there...were no[] material issues of fact. And those plaintiffs were entitled to summary judgment. So, what remained in my mind is how are we going to sort out the folks who are entitled to summary judgment because there

3

is unrebutted evidence that they worked uncompensated overtime with the knowledge of their supervisors from the plaintiffs about whom the proof is much more muddled.

(Id., 5). The Court further explained that "[a]s to the question of uncompensated overtime work, this Court acknowledged that there was evidence in the record that **certain Plaintiffs had not worked uncompensated overtime**, **had not been always been working when they were 'clocked in' to CityTime, or had not worked through their lunch breaks**." (Id., 8) (emphasis added).

Specifically, as to the issues of uncompensated overtime, Plaintiffs could not establish, and the Court could not reach uniform conclusions, whether all Plaintiffs worked uncompensated overtime:

> As to the question of uncompensated overtime work, this Court acknowledged that there was evidence in the record that certain Plaintiffs had not worked uncompensated overtime, had not been always been working when they were 'clocked in' to CityTime, or had not worked through their lunch breaks. This Court found, however, that although there was testimony that 'not all the Plaintiffs were working every minute that they were clocked in to CityTime, and that some remained on work premises without performing work,' that certain of the Plaintiffs had 'demonstrated as a matter of law that they performed uncompensated [overtime] work during pre-shift, post-shift, and lunchtime hours.'

(Id., 8-9). The Court further noted that, while some of the Plaintiffs who provided deposition testimony presented evidence demonstrating actual or constructive knowledge of off-the-clock work, it did not reach a uniform conclusion as to all 42 Plaintiffs who were deposed:

> As to the issue of the City's actual or constructive knowledge that Plaintiffs were working uncompensated overtime, this Court found 'abundant evidence that City managers and supervisors were aware that Plaintiffs were engaged in uncompensated overtime work.' While acknowledging that there was evidence that '[b]ecause of the varied schedules and work locations, Managers do not always see every employee, everyday,' and that overtime authorization was frequently authorized after the overtime was worked' the Court concluded that 'there is overwhelming evidence that the City had actual or constructive knowledge of Plaintiff's uncompensated overtime.'

(Id., 9).

As this Court notes in its opinions, questions of whether a Plaintiff worked uncompensated overtime and whether management possessed knowledge of uncompensated overtime are highly individualized inquiries dependent upon, *inter alia*, the employee, the employee's individual

4

timekeeping practices (i.e., whether they submit requests for payment, why they did not submit requests, etc.), the employee's individual application of timekeeping policies, the employee's arrival, departure, and/or lunch practices, the managers' enforcement of City policies and practices, the extent to which the individual manager witnessed or observed pre-shift, post-shift or lunch work, etc.

Plaintiffs' moving papers offer no assurance that a trial limited to evidence offered by a subset of the 42 Plaintiffs will prove that the other 1,217 Plaintiffs worked uncompensated overtime with the City's knowledge.  As this Court's opinions clearly demonstrate that experiences of the 42 deposed Plaintiffs are varied, they are not similarly situated and proceeding as a collective is not appropriate.

## FACTUAL BACKGROUND

The 1,261 Plaintiffs in this action work at 27 different locations across the 5 boroughs under the supervision of hundreds of different managers.  The Child Protection Manager ("CPM") oversees 3 units, each consisting of 1 CPSS II and up to 5 CPSs or CPSS Is. (Id.., Ex. A, Thomas Dep. 61, 63). The CPS II supervises each unit and maintains responsibility for timekeeping, overtime approval, and assigning work. (See Defendant's Local Rule 56.1 Statement of Undisputed Material Facts ("56.1 Statement") (Dkt. 139), ¶¶ 139, 146, 152, 153). The City maintains lawful time and attendance policies which, if properly followed, result in payment for all hours worked, inclusive of premium pay for hours worked pre-shift, through an auto-deducted lunch, or post-shift.

## I.    The City's Time And Attendance Policies And Practices

### A.    The CityTime System

CityTime, the City's proprietary web-based timekeeping and payroll system, is used by all City employees to record time worked and leave taken so that they can be paid accurately. (Ekelman Cert., Ex. B, Pestana Dec. ¶ 3; Ex. C, Marin Dep. 55). Since 2009, ACS requires all staff (including Plaintiffs) use CityTime.  (Id., Ex. C, 31). Plaintiffs may record arrival and departure

time using either data collection devices, Web Clock on their computer at their workstation, or by manually entering their time in CityTime. (Id., Ex. C, 34-37, 50, 71-72; Ex. D, Bates No. D011814). Hand scanners are placed in work locations easily accessible to employees. (Id., Ex. E, Pestana Dep. 102-03).

### B.    Scheduling Policies

Plaintiffs are scheduled to work an 8 hour shift with a mandatory unpaid 1 hour lunch break. (Id., Ex. F, Covington Dep. 39-40; Ex. D, Bates No. D011813; Ex. G, Bates No. D000257). Pursuant to the ACS Time and Leave Policy, Plaintiffs can be assigned a flex time schedule whereby they can report to work within 1 hour of a designated start time. (Id., Ex. F, 48-49; Ex. D, Bates No. D011813-D-011814; Ex. G, Bates No. D000257). Where a Plaintiff has a flex time schedule, the end of the regular work day is 8 hours after the employee's shift began that day, such that if the worker started at 8:00 am, the end of the regular shift would be 4:00 pm., and if work started at 9:00 am, the end of the regular shift would be at 5:00 pm. (56.1 Statement, ¶ 22).  ACS considers employees with flex schedules on time so long as they clock in within their flex window. (Ekelman Cert., Ex. C, 37-38). Plaintiffs can also be assigned a straight time schedule whereby the employee must clock in to work within 5 minutes after scheduled start of the shift, otherwise the employee is late. (Id., Ex. C, 38-39; Ex. D, Bates No. D011815; Ex. G, Bates No. D000257).

The ACS Time and Leave policy requires each employee to take a 1 hour duty free lunch break. (Id., Ex. F, 50; Ex. G, Bates No. D000257; Ex. D, Bates No. D011813). The 1 hour meal break is automatically deducted from the scheduled hours and may be taken at any time between 12:00 pm and 2:00 pm. (Id., Ex. C, 47-48; Ex. F, 40, 50, 60). ACS maintains a policy that all non-managerial employees are not permitted to perform work-related tasks before the start time of their scheduled hours, during a meal break or after the end of their scheduled shift unless the work has been

preapproved by the appropriate supervisor. (Id., Ex. F, 115; Ex. J, Bates No. D00248).

### C.    Overtime Procedure And Payments To Plaintiffs

The ACS Time and Leave policy states "[a]n employee may not start work before the regularly scheduled starting time nor work beyond the regular departure time without specific approval from the appropriate Supervisor." (Id., Ex. G, Bates No. D00257; Ex. D, Bates No. D011813). The policy, furthermore, instructs employees to "enter their time accurately in CityTime, verify the time started on his/her timesheet, and then submit the timesheet to his/her Supervisor for approval each week." (Id., Ex. D, Bates No. D011814).

Employees are responsible for submitting overtime requests in CityTime for hours worked outside of normal schedules. (Id., Ex. C, 27, 60; Ex. E, 85-86; Ex. F, 86-87, 101). The same process is used for submitting an overtime request in CityTime for hours worked pre-shift, post-shift or during a meal period. (Id., Ex. C, 117; Ex. I, Nealy Dep. 39). Although the City's policy requires pre-approval of all overtime, when Plaintiffs are unable to obtain pre-approval, authorization may be obtained subsequent to working the overtime. (56.1 Statement, ¶ 65).  If an employee fails to request overtime in a given week, the employee can make the request at any later date. (Ekelman Cert., Ex. C, 140-41). Plaintiffs utilize weekly overtime authorization forms – 340c – to secure pre-authorization for work beyond a regularly scheduled shift. (Id., Ex. F, 81; Ex. J, Bates Nos. D000246–D000249).

When the overtime authorization request is made, the employee does not know how many hours of overtime they are going to work, only that they are going to work overtime. (Id., Ex. F, 93-94). The weekly overtime authorization form is prepared by the employee seeking approval to work outside of his or her regularly scheduled shift, and then the immediate supervisor signs the recommendation. (56.1 Statement, ¶ 42). The CPSS IIs, as the supervisors for the CPSS I and CPS, discuss the need for the overtime work with their team members and then recommend to the CPM,

that the overtime be approved. (Ekelman Cert., Ex. F, 91-92). In the case of the CPSS II requesting overtime, the CPM recommends to the Deputy Director that overtime be approved. (Id., Ex. F, 92).

Employees who work during their meal period are expected to request overtime for those hours in CityTime. (Id., Ex. F, 60, 102-103; Ex. K, Carter Dep. 4; Ex. L, Bates Nos. D011354–D011357). Indeed, the form 340-c includes a box which Plaintiffs check to request pay for work performed during their meal period so that the employee will be paid for the time worked during the meal break. (Id., Ex. F, 95–96; Ex. J, Bates No. D000248). If the City becomes aware that an employee worked outside of his or her scheduled hours but did not request overtime compensation in CityTime for such time, it is the City's policy to pay the employee for the overtime worked. (Id., Ex. B, ¶ 5).

Plaintiffs consistently testified they understood that in order to be paid for hours worked beyond their regular shift they were required to submit an overtime request in CityTime. (56.1 Statement, ¶ 73). At the end of each week, before submitting their timesheets, Plaintiffs are required to certify the accuracy of their time records—including their overtime requests—in CityTime. (Ekelman Cert., Ex. C, 82–83; Ex. B, ¶ 7; Ex. M, Bates No. D002220). Plaintiffs understood their time entries in CityTime must be accurate.  (56.1 Statement, ¶ 87).

### D.     The City Paid Overtime To Plaintiffs

From June 9, 2011 through April 2, 2016, the City made 542,304 separate overtime payments to Plaintiffs in a total amount of $36,003,532. (Ekelman Cert., Ex. N, Erath Dec., ¶ 9). Furthermore, an analysis of the CityTime records demonstrates that, of records available on 1,202 Plaintiffs, more than 28.7% received overtime payments for work through lunch. (Id., Ex. N, ¶ 9). When properly utilized, the City's time and payroll systems result in payment for all hours worked.

8

## II.   Plaintiffs Testified That Their Claims For Overtime Depend Entirely On Their Individual Circumstances

Plaintiffs' testimony makes clear their overtime claims are rooted in their individual circumstances and disparate actions. For example, Plaintiff Gonzalez testified that since June 2011 she has not performed any work (pre-shift, during lunch, or post-shift) for which she did not receive compensation. (Ekelman Cert., Ex. O, Gonzalez Dep. 35-44). Plaintiff Gonzalez's testimony regarding her personal timekeeping practices and management's approval of her hours worked resulted in compensation for all hours worked:

Q.   Have you been compensated when you worked through your lunch?
A.   Yes.

Q.   And how do you seek compensation for working through your lunch?
A.   I mark the box on the time sheet that says "work through meal," I believe it says, and I submit the request to [CPSS II].
                                        […]
Q.   So if you work through your lunch you check that box?
A.   Yes.

Q.   And since June 2011, that's always been your practice?
A.   Yes.
                                        […]
Q.   Has there ever been a time that you've worked through your lunch and you haven't been compensated?
A.   No.

Q.   Has there ever been a time that you've worked prior to your shift starting and you haven't been compensated?
A.   No.

Q.   Has there ever been a time that you've worked after your shift and you haven't been compensated?
A.   No.

(Id., Ex. O, 48-50). Quite clearly, this Plaintiff has no claim relating to off the clock work.

As to the remainder of the Plaintiffs who were deposed, even a small sampling[2] of the

---

[2] The full testimony demonstrating the individualized nature of Plaintiffs' claims is set forth in the deposition excerpts appended to the Certification of Felice Ekelman, including the relevant portions of the testimony identified infra.

testimony establishes that liability is highly individualized and not suited for collective treatment:

***Plaintiffs' Claims For Pre-Shift and Post-Shift Work are Highly Individualized***:

| | |
|---|---|
| Lania Carter Johnson | Does not perform work prior to her shift starting. (Carter Dep. 21). When she performs pre-shift work, submits authorization requests and receives compensation. (Id., 70-71). |
| Yoschica Smalls | Submits authorization forms for pre-shift and post-shift work and received payment. (Smalls Dep. 101). |
| Michelle Barnes-Kerr | Verbally seeks approval or submits authorization for pre-shift work. (Barnes Dep. 97-99). Most of the time her manager approved the requests. (Id.) |
| Joshua Davis | Comes to work 15 minutes early 2-3 times each month but does not request overtime. (Davis Dep. 39). |
| Geraldine Dorsaint | Although submitted for and received overtime payments for pre-shift work, alleges she performs uncompensated pre-shift work. (Dorsaint Dep. 22). |
| Kellee Davis-Browne | Her personal practice is to start work prior to her shift and has never experienced difficulty obtaining authorization to complete pre-shift work. (Davis Dep. 93-95). Always submitted overtime requests when she worked prior to the start of her shift and for work performed after her shift. (Id., 115). Understands the word "work" to mean performing CPS duties. (Id.). |
| Tyrone Kippins | Has requested authorization for pre-shift work which was approved. (Kippins Dep. 31). Cannot recall any request for pre-shift work being denied. (Id., 94). |
| Vincent Tillett | Submitted overtime requests every week and if performed pre-shift work, followed same approval process. (Tillett Dep. 83-84). Submitted and received approval of post-shift overtime. (Id., 85). |
| Marcia Johnson | Did not submit authorization requests for pre-shift work because it was not pre-approved. (Johnson Dep. 82-83). |
| Le-Toya Baird | Verbally advised supervisors that she performed pre-shift work without submitting overtime authorizations. (Baird Dep. 15-28). |
| Florence Fontaine | Was instructed not to record time for pre-shift work by her supervisor. (Fontaine Dep. 18). |

When properly followed, the policies result in payment for pre-shift and post-shift work. The individualized personal practices and management interactions presented here are not susceptible to representative testimony. "Why" an individual did not receive compensation for pre-shift or post-shift work is dependent upon, *inter alia*, individualized understanding of the policies, personal timekeeping

practices, the individual manager to whom the employee reported, and the individual reasons for not

following the established policy. These questions cannot be answered in a representative manner.

### *Claims for Work Performed During Lunch Depends Upon Individual Circumstances and Timekeeping Practices*

| | |
|---|---|
| Diane Phillip | Received compensation for lunch when she submitted authorizations. On the occasions she was not paid for working through lunch she did not ask for authorization. (Phillip Dep. 108) |
| Jessica Gonzalez | Submitted overtime authorizations when she worked through lunch and received compensation for same. (Gonzalez Dep. 47-48) |
| Cynthia Gallardo | At either supervisor or manager's direction, submitted overtime authorization form for work through lunch. (Gallardo Dep. 30). No instances where she submitted an overtime authorization for work through lunch that was denied. (Id., 31). Although she was not told that she could not receive compensation for lunch, there are times when she does not submit a form. (Id., 32). When she submits an overtime authorization for work through lunch, she is paid. (Id., 32-33). |
| Patrina Reed | Requests overtime up to 4 days per week and knows how to submit for time worked through lunch via CityTime system. (Reed Dep. 29-32). Has and does submit overtime requests for work through lunch (Id., 30). She cannot recall ever being denied overtime when she requested compensation for working through lunch. (Id., 30-31). |
| Jeremiah Massey | Generally takes up to a 40 minute lunch break each day. (Massey Dep. 27). When he properly submitted authorizations, received compensation for pre-shift, lunch, and post-shift work. (Id., 36-38). |
| Keisha Foster | Submits overtime requests for time worked through lunch; however, adds the time to the end of the day rather than as working through lunch. (Foster Dep. 120-122). Accordingly, even if she does not specifically submit for the lunch break, she receives compensation for that time by submitting for the hour. (Id.) Accounts for missed lunches by adding time onto her workday in overtime authorization requests. (Id., 130-132). |
| Pascual Gomez | Works anywhere from 15 to 20 minutes during the course of his lunch breaks, with the remaining 40 to 45 on lunch break. (Gomez Dep. 134). |
| Lania Carter-Johnson | Always takes a full 1 hour break for lunch and never worked through lunch during the course of her 30 years with the City. (Carter Dep. 22). |
| Michelle Barnes-Kerr | Was instructed by supervisors to not submit overtime requests for lunch because they would not be approved. (Barnes-Kerr Dep. 103-105). |
| Evelyn Awuah | Did not submit authorization requests for work through lunch because she was instructed pre-approval was required. (Awuah Dep. 45). |

As described above, some of the Plaintiffs who were deposed take the full 1-hour lunch; others

take 40-45 minutes; others submit overtime authorization forms for payment of time worked through

lunch; and, still, others simply add time worked through lunch to a generic overtime authorization request. Even this sampling of deposition testimony conclusively establishes the highly individualized nature of Plaintiffs' claims with respect to alleged work during the automatically deducted lunch break.

*Alleged Management Knowledge of Off-The-Clock Work is Highly Individualized and Dependent Upon Management Enforcement of City Policies*

| | |
|---|---|
| Cynthia Gallardo | Manually enters time each day and calls her supervisor to check in at the start of her shift. (Gallardo Dep. 26-28). |
| Taisha Pratts | If she works prior to her shift, she will request overtime from her supervisor which is always approved. (Pratts Dep. 29, 31). |
| Yasarina Almanzar | Does not recall if her supervisor was ever present when she reported to work early. Never told any supervisors that she was performing pre-shift work. (Almanzar Dep. 49). |
| Francis Ambris | Although supervisor was not present for pre-shift work, the supervisor "knows" that Ambris was working "[b]ecause of the individual that I am, she knows that I am always at my work." (Ambris Dep. 117-118). |
| Yendry Bonilla | Supervisors aware of post-shift work because she would call them to let them know that work had been completed.  (Bonilla Dep. 147). |
| Tyrone Kippins | No knowledge as to whether any supervisors were aware that he was performing work post-shift. (Kippins Dep. 145). |
| Falin Epps | Testified her CPM knew she worked through lunch because she spoke to her about it. (Epps Dep. at 113). |
| Francis Ambris | Testified she typically does not take the full one hour meal break and while she alleges her supervisor sees this, she never advised her supervisor that she works through her meal break. (Ambris Dep. 33). She has never been directed to work through lunch by a supervisor or manager. (Id., 54). |
| Monet White | Uncertain whether her supervisor is aware whether she works through lunch. (White Dep. 66). |
| Derika Nealy | Testified her CPM witnessed her work through lunch and told her either not to work through lunch or that if she worked through lunch, she should be paid. (Nealy Dep. 50). |
| Tyrone Kippins | Testified when he did a removal with a supervisor, she advised him to make sure to put in for lunch. (Kippins Dep. 36-38). Further testified that his supervisor saw him working through lunch because she was sitting there doing the same thing. (Id.,75). |

A review of this Court's recent decisions demonstrates the individualized nature of the "knowledge" component of Plaintiffs' liability claim. Indeed, the Court relied upon the individual testimony of certain Plaintiffs to establish that managers witnessed them work through lunch, viewed their computer screens, etc., to demonstrate knowledge of hours worked without

compensation. The knowledge is dependent upon: (1) Plaintiffs' individualized practices with respect to start time, stop-time, and lunch; (2) Plaintiffs' individualized practices with respect to timekeeping; (3) the arrival time of managers (i.e., whether they witnessed Plaintiffs perform work); (4) the lunch time practices of managers (i.e., whether they witnessed Plaintiffs perform work during lunch; and (5) whether managers were aware Plaintiffs did not receive compensation for the time worked. None of these inquiries are susceptible to representative testimony due to their individualized nature.

*      *      *      *      *

The City maintains lawful policies and practices that, if followed, result in full payment for all hours worked. Whether an employee deviated from those policies and practices, the reason(s) the employee deviated from those policies and practices, how the employee deviated from those policies and practices, whether a manager properly followed the policies and practices, the reasons the manager failed to properly follow the policies and practices, and a manager's alleged knowledge of uncompensated time are highly individualized questions. Liability turns on individual timekeeping practices, knowledge of the time keeping policies, individualized manager practices, and individualized knowledge of managers. None of these liability issues are suitable for collective treatment or representative testimony.

**LEGAL STANDARD**

The Second Circuit applies a two-step process "for certification of a collective action under § 216(b)" of the Fair Labor Standards Act ("FLSA"). Brown v. Barnes & Noble, Inc., 252 F. Supp. 3d 255, 261 (S.D.N.Y. 2017). First, the court conducts "an initial determination" to notify potential opt-in plaintiffs "who may be 'similarly situated' to the named plaintiffs with respect to whether a FLSA violation has occurred." Myers v. Hertz Corp., 624 F.3d 537, 554-55 (2d Cir. 2010) (internal

13

citations omitted). Plaintiffs may fulfill their burden during the preliminary stage by making a "modest factual showing" demonstrating that both they and the opt-in employees were victims of an unlawful common policy or plan. Id. at 555.[3] At the second stage, the court will "determine whether a so-called 'collective action' may go forward by determining whether the plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs." Id. The second step takes place once a fuller record has been developed. Id. Decertification of the class may take place "if the record reveals" the plaintiffs are not similarly situated, "and the opt-in plaintiffs' claims may be dismissed without prejudice." Id.

The initial step was not triggered here because Plaintiffs did not seek to issue notice of this action to putative Plaintiffs. As substantial discovery has been conducted the Court can proceed with the second stage of the process. Brown v. Barnes & Noble, Inc., No. 1:16-cv-07333 (RA) (KHP), 2018 U.S. Dist. LEXIS 106098 (S.D.N.Y. June 25, 2018); When the court makes its determination at the second stage, "the court examines the proposed class under the following three prongs: (1) common or disparate factual and employment settings of the individual plaintiff's; (2) defenses available which appear common to all plaintiff's or individual to each plaintiff; and (3) fairness and procedural considerations." Seward v. IBM, 2012 U.S. Dist. LEXIS 49688, at *54-55 (S.D.N.Y. 2012); Zivali v. AT&T Mobility, 784 F. Supp. 2d 456, 460 (S.D.N.Y. 2011).

Plaintiff maintains the burden of proving, by a preponderance of evidence (Zavala v. Wal-Mart Stores Inc., 691 F.3d 527, 537 (3d Cir. 2012)), that the opt-in plaintiffs are similarly situated and the court now, in light of the fuller record, "must apply a more stringent standard of proof in determining whether plaintiff's are similarly situated for the purposes of the FLSA." Seward, 2012

---

[3] Several Second Circuit decisions "rejected efforts to conditionally certify collectives where the plaintiffs were unable to demonstrate that employees at locations where they did not work were subject to the same allegedly unlawful policy or practice." Trinidad v. Pret A Manger, 962 F. Supp. 2d 545, 557-60 (S.D.N.Y. 2013).

U.S. Dist. LEXIS 49688, at *54-55. "A similar situation exists if there is a factual nexus between" all of the plaintiffs. Diaz v. Elecs. Boutique of Am., Inc., No. 04-CV-0840E (Sr), 2005 U.S. Dist. LEXIS 30382, at *10 (W.D.N.Y. Oct. 13, 2005).

Whether a collective should be certified "is extremely fact-dependent" and "largely in the court's discretion." Seward, 2012 U.S. Dist. LEXIS 49688, at *56. "Relevant factors include []: whether the plaintiffs are employed in the same corporate department, division, and location; whether they advance similar claims; whether they seek substantially the same form of relief; and whether they have similar salaries and circumstances of employment." Zavala, 691 F.3d at 537. "Plaintiffs may also be found dissimilar based on the existence of individualized defenses." Id. at 536-7. Where a company-wide policy or practice is absent "plaintiffs will have to demonstrate that each individual manager had actual or constructive knowledge that plaintiffs were performing off-the-clock work without proper compensation." Zivali, 784 F. Supp. 2d at 468.

Here, Plaintiffs failed to offer proof of any unlawful common policy or plan carried out by the City.  Further, Plaintiffs cannot meet their burden of establishing any of the factors required to show they are similarly situated for purposes of the FLSA. See id. at 464-68.

**I.     The City's Policies And Procedures Are Lawful.**

The City maintains lawful timekeeping policies and procedures. Plaintiffs' failure to properly utilize these policies and procedures cannot serve as the basis to certify a collective pursuant to 29 U.S.C. § 216(b).

**A.     The City's Automatic Deduction Policy Is Lawful.**

An employer's timekeeping system is lawful so long as it "allow[s] for the complete and accurate recording of all time worked." Zivali, 784 F. Supp. 2d at 461. A timekeeping system that automatically deducts time spent in scheduled meal break is not unlawful.  DeSilva v. N. Shore-

Long Island Jewish Health System, 27 F. Supp. 3d 313, 321 (E.D.N.Y. 2014) ("automatic meal deduction policies are not per se illegal."); see also Wolman v. Catholic Health Sys. of Long Island, Inc., 853 F. Supp. 2d 290, 301 (E.D.N.Y. 2012) ("Defendants adoption of a system that, by default, deducts meal breaks from its employees' compensation does not constitute a policy that violates the FLSA."); Fengler v. Crouse Health Found., Inc., 595 F. Supp. 2d 189, 195 (N.D.N.Y. 2009) ("the mere existence and implementation of a policy or practice of making automatic deductions for scheduled meal breaks in and of itself does not violate the FLSA."); Hinterberger v. Catholic Health Sys., 299 F.R.D. 22, 36 (W.D.N.Y. 2014) ("Courts in this circuit have expressly recognized that automatic meal deduction policies are not per se illegal.").

Courts have consistently held that it is lawful for employers to maintain a policy whereby employees must request pay for working through a meal period, and such policy does not provide the basis for collective treatment of wage claims. The DeSilva Court explained: "there is no specific prohibition against requiring an employee to report having worked in order to receive pay for time worked." 27 F. Supp. 3d at 322. "It simply cannot be the case that merely establishing a process for an employee to report overtime worked transforms a legal policy, namely 'auto-deduct,' into an illegal one." Id.; see also Gordon v. Kaleida Health, 299 F.R.D. 380, 395-96 (W.D.N.Y. 2014) ("several courts have confirmed that requiring employees to take affirmative action to ensure payment for time worked during meal breaks does not support a common theory of statutory violations."); Mendez v. U.S. Nonwovens Corp., 314 F.R.D. 30, 45 (E.D.N.Y. 2016) (court found policy requiring approval of punched time worked prior to start of scheduled shift lawful).

In DeSilva, the plaintiffs alleged the employer violated the FLSA by failing to compensate them for work performed during an automatically deducted meal break. 27 F. Supp. 3d at 319. The

collective was decertified because the plaintiffs "failed to identify any unlawful system-wide policy or practice that was applied uniformly to each[.]" Id. at 320. The court specifically commented that "[w]ithout more, a legal automatic meal deduction for previously scheduled breaks cannot serve as a common bound around which an FLSA collective action may be formed." Id. at 321. The court further concluded that absent a *per se* unlawful policy:

> the alleged FLSA violations arise from a hodgepodge of procedures implemented in varying ways by different managers across numerous departments and locations. As a result, a determination on the merits is not susceptible to generalized proof; it would require individualized inquiries regarding the procedures in place at each department, and the conduct of individual managers and employees.

Id. at 320.

### B.   The City's Policy Of Paying By Schedule And Requiring Pre-Approval Of Overtime Is Lawful.

Courts have consistently held that an employer's policy requiring that overtime be pre-approved is not a *per se* unlawful policy sufficient to establish that members of a putative collective are similarly situated. See; Zivali v. AT&T Mobility, LLC, 784 F. Supp. 2d 456, 462 n.3 (S.D.N.Y. 2011) ("Requiring pre-approval for overtime, and disciplining employees for working overtime that has not been authorized, is not unlawful Lynch v. City of N.Y., No. 16-cv-5677 (KBF), 2017 U.S. Dist. LEXIS 178855, at *5-6 (S.D.N.Y. Oct. 27, 2017) (motion to decertify collective granted where the city required employees, who utilized the very same CityTime application, to obtain pre-approval for overtime payments); Ruiz v. Citibank, N.A., 93 F. Supp. 3d 279, 284 (S.D.N.Y. 2015) (motion for collective certification denied where employer maintained a policy that "overtime must be approved in advance").

In Zivali, the court conditionally certified a collective where the plaintiffs alleged the employer failed to compensate them for off-the-clock work under policies that included, *inter alia*, a prohibition against off-the-clock work and a requirement that an employee obtain pre-

approval before working overtime. <u>Zivali</u>, 784 F. Supp. 2d at 459-60. At the second stage, however, the court decertified the collective, in part, on the grounds that the plaintiffs failed to identify a *per se* unlawful policy. <u>Id.</u> at 461 ("it is clear that both the MyTime system itself and Mobility's related policies are lawful."). The court specifically explained that "[r]equiring pre-approval for overtime […] is not unlawful." <u>Id.</u> at 462 n.3. Similar to <u>DeSilva</u>, the court concluded that, absent a *per se* unlawful policy, the plaintiffs relied upon the "practices" and "culture" of the employer which inevitably "involve[s] highly individualized situations." <u>Id.</u> at 462-63.

In <u>Mendez</u>, the plaintiffs alleged a company policy of paying employees according to scheduled rather than punched hours constituted an unlawful policy. <u>Mendez</u>, 314 F.R.D. at 45. Specifically, the plaintiffs claimed "the Defendants had a policy of paying employees only based on the shifts that they worked, and not according to when they punched into and out of the factory[]" thus depriving employees of overtime <u>Id.</u> The court, however, held the policy constituted a lawful practice: "the fact that the Defendants had a general practice of paying employees based on their shift schedule does not, on its face, raise an inference that the policy resulted in denying factory and warehouse workers wages or overtime." <u>Id.</u> at 46.

*     *     *     *     *

Here, neither the City's automatic deduction of a meal break nor its requirement that an employee obtain pre-approval for overtime constitutes a *per se* violation of the FLSA. Moreover, neither the use of a uniform timekeeping system nor a requirement that an employee begin work after clocking-in violates the FLSA.[4] Additionally, a policy of payment accordance to schedules, rather than punches, does not constitute a violation of the FLSA. To the contrary, this Court never held that the City maintained unlawful policies and concluded only that "<u>some</u> Plaintiffs had

---

[4] Testimony, in fact, established that "not all the Plaintiffs were working every minute that they were clocked in to CityTime, and that some remained on work premises without performing work[.]" <u>See</u> D.E. No. 150, p. 37; D.E. 180 at p. 9.

demonstrated as a matter of law that they performed uncompensated overtime work, of which the City had actual or constructive knowledge." See D.E. No. 180, p. 10 (emphasis in original).

Accordingly, Plaintiffs fail to establish a uniform policy or practice that, on its face, violates the FLSA.  Absent a *per se* unlawful policy, Plaintiffs must demonstrate that the City's practices "are sufficiently uniform and pervasive to warrant class treatment" which, as discussed below, they clearly cannot. Zivali, 784 F. Supp. 2d at 463.

## II.   Plaintiffs' Legal Claims Are Not Susceptible To Collective Treatment

Not only do Plaintiffs fail to identify an unlawful policy underlying their claims, their motion is fatally flawed because they do not identify a common factual employment setting that binds the collective.  As discussed below, the compensability of time allegedly worked inevitably involves highly detailed and individualized inquiries into, *inter alia*, the time spent performing the alleged work (i.e., whether the amount is *de minimis* or sufficiently lengthy to make a meal break compensable), whether the time was spent for the employer or employee's benefit, and the employer's knowledge of the allegedly uncompensated work. The "employer knowledge" component likewise involves an individual analysis of employee reporting of such time. In short, the claims asserted in Plaintiffs' complaint are not susceptible to collective action treatment.

### A.   The Employment Settings Are Disparate.

To determine whether the collective establishes that members of the class share similar employment settings, courts may look to "whether the plaintiffs are employed in the same corporate department, division, and location; whether they advance similar claims; whether they seek substantially the same form of relief; and whether they have similar salaries and circumstances of employment." Zavala, 691 F.3d at 537. The analysis includes a review of the number of employees, location of the employees, number of managers, differences in the

expectations or practices of those managers, and the adherence of those managers to the alleged unlawful policies or practices identified by plaintiffs. See Ruiz, 93 F. Supp. 3d at 300; Zivali 784 F. Supp. 2d at 464-65; see also Thind v. Healthfirst Mgmt. Servs., LLC, No. 14-cv-9539, 2016 U.S. Dist. LEXIS 170503, at *3 (S.D.N.Y. Dec. 9, 2016) ("Differing factual circumstances, particularly with regard to differences in supervisory authority, can provide justification for decertification."); Morano v. Intercontinental Capital Grp., Inc., No. 10-CV-02192 (KBF), 2012 U.S. Dist. LEXIS 100830, at *7 (S.D.N.Y. July 17, 2012) (decertified class in part due to "differences in . . . supervising directives").

In DeSilva, for example, the court reviewed, among other items, the number of departments, business units, positions, management practices with respect to meal breaks, and the practices of employees with respect to reporting time worked. See DeSilva, 27 F. Supp. 3d at 323-35. The court, in decertifying the collective explained that representative testimony could not answer questions of liability because "when [p]laintiffs took meal breaks, and the frequency with which they took them depended upon their particular work environment and their job duties." Id. Among other items reviewed, the court noted that the plaintiffs took lunch at different times and utilized different methods to record work through lunch (e.g., punches, hand-written notes, completion of approval forms, etc. Id. at 324-25.

In Zivali, the court decertified the collective where "the evidence points to an extremely wide range of company practices in the context of varied factual and employment settings." Zivali, 784 F. Supp. 2d at 464.  Likewise, in DeSilva, the court decertified the collective where "the alleged violations arise from a hodgepodge of procedures implemented in varying ways by different managers across numerous departments and locations." DeSilva, 27 F. Supp. 3d at 320. The court in Hinterberger similarly decertified a class involving employees at eleven (11) different

20

"hospitals, adult homes, and nursing homes" because "a determination on the merits is not susceptible to generalized proof, but will required individualized inquiries regarding the procedures in place at each department, and the conduct of individual managers and employees." Hinterberger, 299 F.R.D. at 54-55.

In Seward v. IBM, the court held that all three factors weighed in favor of decertification. 2012 U.S. Dist. LEXIS 49688, at *95. Specifically, the court ruled that the plaintiff failed to demonstrate that he shared "common factual and employment settings with all of the opt-in plaintiffs," as a result of a "uniform and pervasive policy requiring off-the-clock work" due to the various team functions, job duties, and individual plaintiff experiences. Id. at *80; see Zivali, 784 F. Supp. 2d at 463-67; see also King v. CVS/Caremark Corp., No. 07-21824-Civ., 2008 U.S. Dist. LEXIS 108614, at *1, *6 (S.D. Fla. Sept. 11, 2008) (decertifying a class of only sixteen plaintiffs due to "variation in stores, management practices and factual disparities as to each Plaintiff").

Here, Plaintiffs work in 3 different positions, in 27 different locations, under hundreds of different managers. The disparate employment settings are patently clear as set forth in the Factual Background section:

- All Plaintiffs maintain flexible schedules with differing start times and end times.
- Plaintiffs report to hundreds of different managers across the 5 boroughs.
- Plaintiffs work at 27 different facilities.
- **Timekeeping practices vary by Plaintiff**: for example some Plaintiffs who perform pre-shift work submit overtime requests for such time.
- Other Plaintiffs who perform pre-shift work do not submit overtime requests or, in the alternative, may not submit requests that capture all pre-shift time worked.
- **Lunch practices vary by Plaintiff**: some Plaintiffs take full 1 hour uninterrupted lunch breaks.
- Other Plaintiffs submit overtime request forms when they work through lunch.
- Other Plaintiffs work through lunch and do not submit overtime request forms.
- Still other Plaintiffs work through lunch and submit an overtime request as post-shift work.
- Some Plaintiffs take 40-45 minute lunch breaks.
- Some Plaintiffs eat lunch at their desks, while some go out to eat.

- **Management knowledge varies**: Some Plaintiffs allege managers witness Plaintiffs working pre-shift, through lunch, and post-shift.
- Some Plaintiffs report their pre-shift, lunch, and post-shift work to their managers.
- Some managers are not present when a Plaintiff works pre-shift or post-shift but Plaintiffs still believe the manager is aware that they performed work.

As in <u>Zivali</u>, <u>DeSilva</u>, and <u>Hinterberger</u>, the factual circumstances are wholly disparate. Plaintiffs seek to certify a class of three (3) positions with one being wholly disparate, the CPSS II. Specifically, the CPSS II is responsible for, *inter alia*, supervision of the CPS and CPS II positions. To the extent a CPS or CPS I alleges deviations from the City's lawful policies or practices occurred, those may very well be the fault of the CPSS II Plaintiff. Furthermore, the CPSS II plays a role in the overtime approval process. Plaintiffs ask this Court to certify a collective where the CPSS II may self-determine liability for the entire collective.

Additionally, as in <u>DeSilva</u>, the schedules, lunch schedules, and practices for recording time (if recorded at all) or reasons for not recording time, vary from Plaintiff to Plaintiff. As set forth above, some Plaintiffs completed overtime authorization forms for pre-shift, lunch and post-shift hours. Another Plaintiff managed to capture all of her lunch time by submitting an authorization form for post-shift work. Other Plaintiffs claimed their manager witnessed them work pre-shift, lunch or post-shift hours without compensation. Some Plaintiffs had a practice of taking the full 1 hour lunch, while others took a 40 to 45 minute lunch break. Not to mention, these 1,261 Plaintiffs work in units of 4-5 CPS and CPSS Is which are supervised by hundreds of different CPSS IIs and CPMs across 27 separate offices throughout the 5 boroughs. The end result is the very same "hodgepodge" that led the courts in <u>DeSilva</u>, <u>Zivali</u> and <u>Hinterberger</u> to decertify the collectives in those matters.

The Court's opinions are illustrative of the point. Specifically, the September 30, 2017 opinion includes a 4 page analysis of differing circumstances surrounding Plaintiffs' practices with respect to recording and submitting for pre-shift, lunch, and post-shift hours worked. (Dkt. 150,

pp. 11-14). In its second Order, this "Court acknowledged that there was evidence in the record that certain Plaintiffs had not worked uncompensated overtime, had not always been working when they were 'clocked in' to CityTime, or had not worked through their lunch breaks." (Dkt. 180, p. 8). This Court further noted the evidence demonstrated "varied schedules and work locations, [and that] Managers do not always see every employee, every day[.]" (Id. at p. 9). Indeed, some overtime was approved (often after the overtime was actually worked) while other overtime was rejected. (Id.)

Clearly, given this showing, even the Plaintiffs who were deposed are not similarly situated. Thus collective treatment of this action is not appropriate.

**B.** **The Compensability Of Alleged Work Performed During Pre Shift Hours, Meal Periods, Or Post Shift Hours Is Individualized, Highly Fact Specific, And Subject To Individualized Defenses.**

To establish liability under the FLSA, a plaintiff must demonstrate that he performed work, never received compensation for that work, "and that the employer had actual or constructive knowledge of that work." Kuebel v. Black & Decker, Inc., 643 F. 3d 352,365 (2d Cir. 2011); Hinterberger v. Catholic Health Sys., 299 F.R.D. 22, 37 (W.D.N.Y. 2014); Zivali v. AT&T Mobility, LLC, 784 F. Supp. 2d 456, 468 (S.D.N.Y. 2011) ("In the absence of a company-wide policy or practice, plaintiffs will have to demonstrate that each individual manager had actual or constructive knowledge that plaintiffs were performing off-the-clock work without proper compensation."); Seward v. IBM, 08cv3976 (VB) (PED), 2012 U.S. Dist. LEXIS 49688, *88-89 (S.D.N.Y, Jan. 20, 2012). "[E]ven where records to which an employer had access to indicate that particular employees are working during lunch periods, it is not necessarily sufficient to establish constructive knowledge that the employees were not reporting their time." Gordon v. Kaleida Health, 299 F.R.D. 380, 393-94 (W.D.N.Y. 2014); see also Hertz v. Woodbury Cty., 566 F. 3d

775, 781-82 (8th Cir. 2009) (unreasonable to require county to review records to determine if employee worked beyond scheduled hours "particularly true given the fact that the County has an established procedure for overtime claims[.]""); see also Newton v. City of Henderson, 47 F. 3d 746, 749 (6th Cir. 2012) ("access to information does not constitute constructive knowledge" of an employee working overtime hours). "The relevant knowledge is not 'I know the employee was working,' but 'I know the employee was working and not reporting his time." Hinterberger, 299 F.R.D. at 37 quoting White v. Baptist Mem'l Health Care, Corp., 699 F. 3d 869, 875 (6th Cir. 2012).

Courts adopt a flexible approach to an analysis as to whether a meal break may be compensable such that "infrequent interruptions of short duration which may occur" do not render a meal break compensable. Reich v. S.New.Eng. Tel. Corp., 121 F. 3d 58, 64 (2d Cir. 1997) (citations omitted). Such de minimis interruptions, which are analyzed individually, do not change the bona fide character of the meal break. See, e.g., DeSilva, 27 F. Supp. 3d at 31-32 (decertifying case where defenses included de minimis exception explaining such defenses are "highly fact specific[.]"); Zivali, 784 F. Supp. 2d at 468 (decertifying case because "the extent to which work was de minimis [] will necessarily vary widely according to the particular situation of each individual plaintiff.").

Furthermore, where an employee unreasonably fails to utilize procedures to report hours worked, no FLSA violation occurs. See Hinterberger, 299 F.R.D. at 45 ("[w]hen the employee fails to follow reasonable time reporting procedures she prevents the employer from knowing its obligation to compensate the employee and thwarts the employer's ability to comply with the FLSA.") (citations omitted). "[T]here is no duty to ensure that employees are not working through unpaid meal breaks, and employers utilizing an automatic meal deduction policy may legally shift

the burden to their employees to cancel the automatic deduction if they work through an unpaid meal break." Wolman, 853 F. Supp. 2d at 301. "Where an employer has no knowledge that an employee is engaging in overtime work and that employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is not a violation of the FLSA." Gordon, 299 F.R.D. at 392 (citations omitted).

In Gordon, the court denied motions for summary judgment and certification pursuant to Fed. R. Civ. P. 23 where the plaintiffs alleged employees worked through an auto deducted meal break without compensation. Gordon, 299 F.R.D. at 383. The court specifically ruled as to plaintiffs' meal break claims that "reasonable minds could differ as to whether [the employer] had actual or constructive knowledge of unreported, uncompensated time." Id. at 392. The court denied the motion for certification because, in part, the plaintiffs "have not identified any question of law that remains unanswered or that can be resolved through representative testimony[.]" Id. at 404.

In Zivali, the court granted the defendant's decertification motion with respect to a collective that alleged, similar to the matter at bar, uncompensated hours and work through an auto deducted meal break. Zivali, 784 F. Supp. 2d 456 (S.D.N.Y. 2011). The Court explained the reasons for decertification as follows:

> [P]laintiffs must demonstrate that [the employer] had actual or constructive knowledge of the off-duty work performed. ***In the absence of a company-wide policy or practice, plaintiffs will have to demonstrate that each individual manager had actual or constructive knowledge that plaintiffs were performing off-the-clock work without proper compensation.*** The record suggests that the knowledge of each individual manager varies widely. Similarly, [the employer] can defend against some of plaintiffs' claims by demonstrating that certain off-duty work was de minimis. The extent to which work was de minimis, however, will necessarily vary widely according to the particular situation of each individual plaintiff.

Id. at 467-68 (emphasis added).

In DeSilva, the court noted the availability of the de minimis exception as to

uncompensated off-duty work and meal time. DeSilva, 27 F. Supp. 3d at 325-26. Furthermore, the court explained "knowledge of each individual manager regarding employees' unpaid work varied widely. Some knew, or should have known, that not all meal period work was properly compensated while others may not have been aware that Plaintiffs were performing such work." Id. Noting the "knowledge" and "de minimis" defenses, the court decertified the collective and explained "it is clear that [the employer's] potential defenses will be highly fact specific and therefore weigh against proceeding with this case as a collective action." Id. at 326.

In Hinterberger v. Catholic Health Sys., 299 F.R.D. 22 (W.D.N.Y. 2014), the court denied the plaintiffs' motion for summary judgment with respect to an auto deducted lunch break. The court explained the analysis of liability would be required on a "department-by-department or perhaps an employee-by employee basis whether [the employer] had actual or constructive knowledge of unpaid work performed for its benefit." Id. at 43. The court, in turn, decertified the collective because the claims asserted (i.e., constructive or actual knowledge of off-the-clock work or through an auto deducted meal period) were "not susceptible to generalized proof, but will require individualized inquiries regarding the procedures in place at each department, and the conduct of individual managers and employees." Id. at 55.

Here, there can be no question that the compensability of pre-shift, lunch, and post-shift work requires highly individualized, fact-sensitive analyses. As set forth above, the analysis includes, *inter alia*, the individual Plaintiff's adherence of the timekeeping policies and procedures; the individual Plaintiff's actual practices with respect to pre-shift work, lunch, and post-shift work (i.e., do they record the time, do they advise their manager of the time, do they independently decide not to submit for compensation, etc.); the reason(s) for deviation from the practice; each Plaintiff's manager's application of the City's timekeeping policies or procedures;

individual communications between managers and Plaintiffs regarding timekeeping policies and procedures; and the City's knowledge of the allegedly uncompensated work.

The Court, in its summary judgment opinion and clarification thereof, noted the remarkable differences among even the miniscule sample of the 42 deposed Plaintiffs. (Dkt. 150, pp. 11-14). As for knowledge of the alleged uncompensated overtime, these Plaintiffs relied upon claimed eyewitness testimony. (Id., 14-17). This Court concluded that "there was evidence that '[b]ecause of the varied schedules and work locations, Managers do not always see every employee, everyday,' and that overtime 'authorization was frequently authorized after the overtime was worked[.]'" (Dkt. 180, p. 9). Plaintiffs could not conclusively demonstrate, and the Court clearly could not conclude, that the City even possessed knowledge of the pre-shift, lunch, and post-shift work claimed by all of the 42 deposed Plaintiffs. To this date, neither Plaintiff nor the Court has identified which of 42 Plaintiffs obtained summary judgment and which Plaintiffs must prove their case at trial. Yet, despite this utter lack of consistency with respect to the experiences of the 42 deposed Plaintiffs, Plaintiffs' claim that the claims of 1,261 individuals are suitable for representative testimony and collective treatment. As Plaintiffs' situations are not similar, this Court, must deny the pending motion for certification.

**C.    Plaintiffs Fail To Properly Address Notions Of Fairness And Procedural Considerations And, Consequently, Fail To Meet The Burden Of Establishing They Are Similarly Situated.**

To determine whether fairness and procedural considerations support decertification, the courts typically consider "whether a collective action would lower costs to the plaintiffs through pooling of resources, efficiently resolve common issues of law and fact, and coherently manage the class in a manner that will not prejudice any party." DeSilva, 27 F. Supp. 3d at 326-27 (citations omitted); see also Zivali 784 F. Supp. 2d at 468 (the court reviews the "advantage of lower

individual costs to vindicate rights by the pooling of resources," and whether the "judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity.") (citations omitted). However, "cost savings 'do[] not override the negative effects that certification is very likely to have on the fairness and manageability of the proceedings." DeSilva, 27 F. Supp. 3d at 327 (citations omitted).

In DeSilva, the court decertified a collective on the grounds that the plaintiffs failed to demonstrate they were similarly situated and, accordingly, could establish neither fairness nor efficiency with respect to manageability. The court explained:

> As in other [...] "auto deduct" cases that have been decertified, here Plaintiffs' counsel generally suggest that the individualized inquiries could be handled through representative testimony, bifurcation or subclassification, [yet] offer no meaningful explanations of how this can be accomplished. At this stage, Plaintiffs needed to provide more than bare assurances regarding trial manageability; it was incumbent on them to account for the rampant factual differences [...] and to demonstrate how this case could be tried fairly, based on common proof.

Id. (citations omitted).

In DeSilva, the Court decertified a collective on the grounds that the significant disparate individual circumstances of the plaintiffs precluded a finding that they were similarly situated, and accordingly, could establish neither fairness nor efficiency with respect to manageability. Id. at 326-27. The same is true here. Although certification of a collective action will lower the costs to the parties and that common questions of law and fact, theoretically, would be more efficiently resolved, it would be fundamentally unfair given the incontrovertible evidence that any liability in this case is predicated on individual circumstances, not a common policy. Indeed, where the first two factors weigh "against proceeding as a collective action," the third factor follows. See Seward, 2012 U.S. Dist. LEXIS 49688, at *95. As such, Plaintiffs' request for certification must be denied.

28

**III.**   **Plaintiffs Incorrectly Rely Upon *Briceno*,  *Ayers*, And *Pefanis***

Plaintiffs incorrectly rely on cases that are distinguishable to the case at hand. In Briceno v. USI Services Group, plaintiffs were allowed to proceed as a certified class where they were all subject to a defective call-in timekeeping system. No. 09-CV-4252(PKC), 2015 U.S. Dist. LEXIS 132185, at *12, 41 (E.D.N.Y. Sep. 29, 2015). This telephonic call-in system utilized to record time inaccurately reported employees' hours. Id. at *16-17. Multiple employees complained to their supervisors because when they would call into the system they would receive an operator's response that the number was invalid. Id. The employees were not aware of the company's meal break or timekeeping policies, and a handful of employees testified they were **never** allowed to take a lunch break. Id. at *16-19. Briceno focused on an automated timekeeping system that was defective and failed to record all hours worked by the employees, and therefore the court denied the decertification motion. Id. at *34-35. Because the crux of the case was the defective universal call-in timekeeping system, there were no individual circumstances of employment settings or decisions made by individuals present. Id.

In comparison, Plaintiffs were aware of the CityTime timekeeping system, automatic meal deduction, and pre-approval requirement. Plaintiffs were not told they could not take lunch and in fact were encouraged to do so. The facts, moreover, demonstrate the City's timekeeping and payroll systems are operable; resulted in payment of 99.6% of the 542,304 overtime requests received; netted Plaintiffs more than $36 million in overtime payments over a 5 year period; included payments to  more than 25% of the class for hour worked during the automatically deducted break. Briceno is vastly different because Plaintiffs here do not point to any evidence or allege the timekeeping system is defective. See Lynch, 2017 U.S. Dist. LEXIS 178855, at *5.

In Ayers v. SGS Control Services, decertification was denied where plaintiff's differences

29

did not outweigh the similarities where all employees were equally affected by alleged late payments, a bonus plan, and "fluctuating workweek" payment method which caused regular base salaries occasionally to fall below minimum wage. 2007 US Dist. LEXIS 19634, at *20 (S.D.N.Y. Feb. 27, 2007). The present case is distinguishable from Ayers as Plaintiffs fail to identify any policy that uniformly or similarly impacted the proposed collective as the plaintiffs did in Ayers.

Plaintiffs cite to Pefanis v. Westway Diner, where the court found employees working at a single 24/7 restaurant were "common victims of a FLSA violation" enforced by a single manager and denied decertification. 2010 U.S. Dist. LEXIS 93180, at *2, 10 (S.D.N.Y. Sep. 7, 2010). Unlike Pefanis where the employer failed to prove the two plaintiffs presented "disparate factual circumstances," here the record reflects disparate employment and factual circumstances across many plaintiffs and supervisors. Plaintiffs chose to focus their argument on three cases that were factually dissimilar, but two of which dealt with illegal or corrupt activities – both absent in the present case.

## CONCLUSION

For the reasons set forth herein, Defendant respectfully requests that the Court deny Plaintiffs' motion for certification.

Respectfully submitted,

JACKSON LEWIS P.C.
*ATTORNEYS FOR DEFENDANT*
666 Third Avenue, 29th Fl.
New York, New York 10017

By:     *s/Felice B. Ekelman*
        FELICE B. EKELMAN

Dated: New York, New York
       August 23, 2018

4849-5361-0096, v. 1