

Gregory K. McGillivary
gkm@mselaborlaw.com

December 22, 2021

<u>**VIA ECF**</u>
Hon. Paul G. Gardephe
United States District Court
Southern District of New York
500 Pearl Street, Room 2204
New York, NY 10007

   Re:  *Foster, et. al. v. City of New York,* Case No. 14-cv-4142-PGG

Dear Judge Gardephe:

   Plaintiffs respectfully submit this letter on behalf of all Parties regarding the proposed Settlement Agreement ("Agreement" or "Settlement") between the Plaintiffs and the Defendant, the City of New York ("Defendant" or "City") in the above-referenced case brought under the Fair Labor Standards Act (FLSA). For the reasons set forth below, the Settlement is a fair and reasonable resolution of a *bona fide* dispute and should be approved. The signed Settlement Agreement (Exhibit 1), and a Proposed Order (Exhibit 2) are attached, along with supporting declarations from Plaintiffs' Counsel, Gregory K. McGillivary (Exhibit 3) and Hope Pordy (Exhibit 4). Pursuant to Paragraph 8.1 of the Agreement, should the Court deem a Settlement Approval Conference necessary, the Parties request that a telephonic conference be set within the next 30 days at a time convenient to the Court.[1]

   The Plaintiffs – 1,199 individuals employed or formerly employed by the Defendant as Child Protective Specialists (CPS) and Child Protective Specialist Supervisors (CPSS) – have been fully informed of the terms of the Settlement and have been provided with an opportunity to review the Settlement Agreement. ***There have been no objections to the Settlement.*** The Parties now submit the Settlement Agreement for the Court's consideration pursuant to *Cheeks v. Freeport Pancake House, Inc.,* 796 F.3d 199, 206 (2d Cir. 2015), and *Fisher v. SD Prot. Inc.*, 948 F.3d 593, 599-600 (2d Cir. 2020).

## I.  Claims Asserted and Procedural History

   The lawsuit was initially filed on June 9, 2014, as a single action on behalf of CPS, CPSS and employees in the title of Job Opportunity Specialist (JOS) and Associate Job Opportunity Specialists (AJOS) working for the Defendant's Human Resources Administration. Dkt. 1. At the Defendant's request, the Parties agreed to sever the claims of JOS and AJOS workers into a separate action, *De La Cruz v. City of New York*, Case No. 14-cv-9220, pursuant to Fed. R. Civ. P.

---

[1] Should the Court schedule a Conference, Plaintiffs' Counsel will notify all Plaintiffs of the date and time.

Judge Gardephe
Page 2 of 21

21. Plaintiffs filed an Amended Complaint on August 27, 2014 (Dkt. 18) and a Second Amended Complaint on November 14, 2014 (Dkt. 28).

Specifically, Plaintiffs allege that Defendant violated the FLSA as follows:

1) Defendant failed to compensate Plaintiffs for pre-shift and post-shift work captured in the Defendant's timekeeping system, CityTime ("Uncompensated Pre- and Post-Shift Overtime Claim");
2) Defendant failed to compensate Plaintiffs for overtime work performed during Plaintiffs' unpaid meal ("Meal Period Claim");
3) Defendant failed to properly calculate the regular rate of pay in violation of the FLSA by failing to include night shift differentials and meal allowances in the regular rate ("Regular Rate Claim");
4) Defendant failed to pay overtime at the rate of one and one-half times the regular rate of pay in violation of the FLSA by compensating Plaintiffs for hours in excess of 40 in a workweek with compensatory time or cash at a straight time rate ("Straight Time Claim"); and
5) Defendant failed to pay overtime in a timely fashion ("Late Payment of Overtime Claim").

Plaintiffs also allege that Defendant's conduct lacked good faith and reasonableness, thus entitling Plaintiffs to liquidated damages in an amount equal to their backpay, and that Defendant willfully violated the law, thereby extending the statute of limitations from two to three years under 29 U.S.C. §255(a).

On January 21, 2015, the Court entered the Parties' Joint Stipulation on Phase One Discovery. Dkt. 32. Under the Stipulation, the Parties agreed to conduct discovery using a random sampling of Plaintiffs ("Discovery Plaintiffs") Dkt. 32. Forty-one (41) Discovery Plaintiffs responded to interrogatories and document requests. Additionally, Plaintiffs propounded written discovery on Defendant. Following a discovery dispute concerning the Defendant's good faith defense, the Court ordered Defendant to produce certain documents related to that defense in response to Plaintiffs' Motion to Compel. Dk. 84. Additionally, Plaintiffs' Counsel prepared 41 Discovery Plaintiffs for depositions and defended those depositions. McGillivary Decl., ¶ 10.

Further, Plaintiffs reviewed and analyzed more than 18,600 pages of documents produced by Defendant. Plaintiffs deposed 5 Fed. R. Civ. P. 30(b)(6) witnesses on 48 sub-topics including: Plaintiffs' job duties, Defendant's timekeeping policies and procedures; Defendant's good faith defense; Defendant's claimed FLSA exemption for CPSS, and Defendant's efforts to train Plaintiffs and their supervisors on the FLSA. McGillivary Decl., ¶ 10. Additionally, Plaintiffs deposed two fact witnesses who held the title of Child Protective Manager. *Id.*

While fact discovery continued, on January 22, 2016, Defendant moved to disqualify Plaintiffs' Counsel from the case, arguing that an "unwaivable conflict of interest" prevented Plaintiffs' Counsel from representing both CPS and CPSS. Dkt. 92. Plaintiffs opposed this motion. On October 27, 2016, the Court denied Defendant's motion. Fact discovery concluded in this matter on July 1, 2016.

Judge Gardephe
Page 3 of 21

On January 13, 2017, the Parties cross-moved for Summary Judgment on multiple issues. Plaintiffs moved for summary judgment on Defendant's liability under the FLSA. Specifically, Plaintiffs presented undisputed evidence that the Defendant violated the FLSA by: (1) failing to pay Plaintiffs for compensable work performed before and after the Plaintiffs' shifts in violation of 29 U.S.C. § 207(a); (2) failing to pay Plaintiffs for compensable work performed during the Plaintiffs' unpaid meal period in violation of 29 U.S.C. § 207(a); (3) paying Plaintiffs pre-approved overtime more than two pay periods after the work was performed in violation of 29 U.S.C. § 207(a) and 29 C.F.R. § 778.106; (4) paying Plaintiffs for hours worked over 40 in a workweek at a straight time rate in violation of 29 U.S.C. § 207(a) and 29 U.S.C. § 207(o); and (5) failing to properly calculate the Plaintiffs' regular rates of pay in violation of 29 U.S.C. §§ 207(a) and 207(e). Dkt. 133. Defendant moved for summary judgment on liability asking the Court to: (i) dismiss Counts I and II; (ii) deny Plaintiffs' claims for liquidated damages because Defendant acted in good faith; (iii) limit the statute of limitations to 2 years based on Plaintiffs' inability to prove that any alleged violation by Defendant is willful; and (iv) hold that contractual meal allowance payments were properly excluded from Plaintiffs' regular rate of pay calculation. Dkt. 137.

On September 30, 2017, the Court issued a decision granting Plaintiffs' Motion, in part, and holding that Defendant:

- failed to pay Plaintiffs for compensable work performed before and after the Plaintiffs' shifts and during their meal periods;
- failed to include night shift differential and meal allowance payments in the regular rate of pay for purposes of calculating overtime;
- failed to pay compensatory time at a rate of time-and-one-half for all hours worked over 40 in a workweek; and

Dkt. 153. The Court denied Defendant's summary judgment motion in whole. However, the Court found that disputes of fact required a trial on Plaintiffs' Late Payment of Overtime Claim. *Id.* at 72.

During a November 3, 2017, Court conference, the Defendant informed the Court that it intended to file an interlocutory appeal of the Court's summary judgment decision to the United States Court of Appeals for the Second Circuit. The Parties briefed Defendant's motion for interlocutory appeal. Dkt. 163-166. On June 19, 2018, the Court issued an Order denying the Defendant's motion for certification of an interlocutory appeal. Dkt. 180.

The Court, thereafter, requested both Parties to prepare briefs on whether the Discovery Plaintiffs who gave deposition testimony are "similarly situated" to the non-testifying Plaintiffs for purposes of determining whether the case could be tried using representative testimony from a subset of Plaintiffs. Dkt. 181. The Parties submitted extensive briefing on this issue, citing the testimony of the 41 Discovery Plaintiffs. *Id.* The Court referred the motion to Magistrate Judge Lehrburger for a decision, and on October 30, 2020, Magistrate Judge Lehrburger issued a Report and Recommendation finding that Plaintiffs were similarly situated for purposes of proceeding collectively at trial. Dkt. 212. Magistrate Judge Lehrburger found that the Plaintiffs are similarly situated under the FLSA. *Id.*

The Defendant filed objections to the Magistrate Judge's Report and Recommendation on

Judge Gardephe
Page 4 of 21

December 7, 2020. Dkt. 217. Plaintiffs opposed the Defendant's objections. Dkt. 220. On March 30, 2021, over the Defendant's objections, the Court adopted the Magistrate Judge's October 2020 ruling finding that all Plaintiffs are similarly situated. Dkt. 225.

On April 2, 2021, the parties submitted a joint motion for the completion of expert discovery. Dkt 226. Expert reports, which were prepared based on the voluminous payroll and CityTime data produced by the Defendant for the 1,199 Plaintiffs, were exchanged on May 3, 2021 (Plaintiffs' Report) and May 24, 2021 (Defendant's Rebuttal Report). Expert depositions were completed on June 2 and 3, 2021.

On July 7, 2021, the Court issued an Order scheduling this case for a jury trial beginning January 31, 2022. Dkt. 229. After the parties sought clarification from the Court on the scope of the issues to be tried, the Court issued an Order on August 22, 2021, that specified that the trial would be solely on the issue of damages. Dkt. 231.

In August 2021, the Parties began arms-length settlement negotiations and reached a settlement in principle on November 29, 2021. Dkt. 237.

## II.    Terms of the Proposed Settlement Agreement

The Agreement provides that Defendant will pay a total Settlement Amount of $42,900,000.00 to resolve the lawsuit. The Settlement Amount will be paid as follows: (1) a set of payroll checks and/or direct deposit payments made payable to each Plaintiff in accordance with Plaintiffs' Counsel's instructions constituting his or her share of the backpay award in the amount of $20,339,000.00 ("the Backpay Amount"); and (2) one check in the amount of $22,561,000.00 constituting liquidated damages, attorneys' fees, litigation expenses and Service Awards payable to Plaintiffs' Counsel for appropriate distribution to the plaintiffs ("Lump Sum Amount").

Plaintiffs and their Counsel have an agreement regarding the distribution[2] of the Lump Sum Amount which is reflected in the Settlement Agreement. The Lump Sum Amount will be distributed as follows: (1) $9,494,963.50 in net liquidated damages; (2) $72,000.00 in service awards ("the Service Award Amount"), with the three Settlement Team members (who were also Discovery Plaintiffs) receiving $5,000.00 each, and the 38 remaining Discovery Plaintiffs who served the class by participating in discovery and depositions each receiving $1,500.00; (3) $177,195.00 in out of pocket expenses to Plaintiffs' Counsel; and (5) a 30% contingency fee to Plaintiffs' Counsel in the amount of $12,816,841.50 calculated after expenses are deducted. Each Plaintiff individually agreed, in writing, to a 30% contingency fee when they retained the law firms.

The backpay and net liquidated damages portion of the Settlement Amount were calculated by Plaintiffs' Counsel and will be divided among the Plaintiffs as follows: For each week that a

---

[2] Defendant takes no position regarding the distribution of the Lump Sum Amount as the distribution amounts were determined solely by Plaintiffs' counsel pursuant to their agreement with Plaintiffs.

Judge Gardephe
Page 5 of 21

Plaintiff worked as a CPS or CPSS during the recovery period, the Plaintiff received one point.[3] The recovery period for each Plaintiff is the period commencing three years prior to the date a Plaintiff's consent-to-sue form was filed in Court up to December 20, 2021, or their last day of employment, whichever is earlier. The points were then divided into $29,833,963.50, which reflects the Net Settlement Fund, to determine the dollar value of a point. The Net Settlement Fund is the backpay amount plus the liquidated damages amount after attorneys' fees, litigation expenses, and Service Awards are deducted.  Exhibit A to the Settlement lists Plaintiffs' distribution amounts after attorneys' fees and expenses are deducted.

As reflected in Paragraph 2.4 of the Agreement, Plaintiffs have entered into individual agreements with Plaintiffs' Counsel. These agreements provide for a contingency attorney fee amount equal to thirty percent (30%) of the Settlement Amount calculated after litigation expenses are deducted from the Settlement Amount. Plaintiffs and their counsel are solely responsible for determining the contingency attorney fee applicable to this Agreement. Plaintiffs' Counsel shall deduct their contingency attorney fee in the amount of $12,816,841.50 from the Lump Sum Amount in accordance with Plaintiffs' individual agreements with Plaintiffs' Counsel.

---

[3] The methodology of using weeks of employment during the relevant statute of limitations period to determine the Plaintiffs' amounts is the methodology used in other FLSA cases involving complicated off-the-clock claims and a variety of different claims wherein the risks and valuations of each claim and the amounts of work time the Plaintiffs may win are difficult to separately quantify for each Plaintiff and for each claim. *E.g., Matias v. City of New* York, Case No. 21-cv-1736-GHW Dkt. 39 (October 29, 2021) (approving settlement agreement for School Safety Agent Level 3 title at NYPD using same distribution methodology); *Campbell v. City of New York,* Case No.: 16-cv-8719 (AJN) (SDA), Dkt. 186, (S.D.N.Y. Sept. 17, 2021) (approving settlement agreement for DHS security officers using same distribution methodology); *Murray et al., v. City of New York;* Case 1:16-cv-08072 (PKC), Dkt. 228 (S.D.N.Y. Apr. 23, 2021) (approving settlement agreement for various administrative titles at DHS using same distribution methodology); *Lawtone-Bowles et al., v. City of New York,* Case 1:16-cv-04240 (AJN) (OTW), Dkt. 157 (S.D.N.Y. Apr. 8, 2021) (approving settlement agreement for DHS motor vehicle operators using same distribution methodology); *Bookman et al., v. City of New York*, Case 1:18-cv-04338 (AJN) (OTW), Dkt. 102 (S.D.N.Y. Apr. 8, 2021) (same); *Worley et al., v. City of New York*, Case 1:17-cv-04337 (LGS), Dkt. 230 (S.D.N.Y. Jun. 8, 2020) (approving settlement agreement for NYPD school safety agents using same distribution methodology); *Perry v. City of New York*, Case 1:13-cv-01015 (VSB) (S.D.N.Y. Feb. 13, 2020) (approving settlement agreement for FDNY Fire Inspectors using same distribution methodology); *Jones v. New York City Housing Authority*, 1:17-cv-3683 (JGK) (S.D.N.Y. Dec. 17, 2018) (approving FLSA settlement agreement for NYCHA housing assistants using same distribution method); *Brown v. New York City Housing Authority*, 1:16-cv-9263(RA) (S.D.N.Y. Sep. 14, 2018) (approving FLSA settlement agreement for 856 NYCHA maintenance workers and heating plant technicians using same distribution method); *Johnston v. New York City Housing Authority,* 1:16-cv- 9924 (S.D.N.Y. Jan. 19, 2018) (approving settlement agreement using same distribution methodology at issue here for NYCHA Exterminators); *Small v. City of New York,* 1:14-cv-3469 (S.D.N.Y. May 15, 2015) (approving settlement of FLSA claims by NYPD police sergeants using same distribution methodology used here); *Mullins v. City of New York*, 1:06 cv 20238 (SAS) (same).

Judge Gardephe
Page 6 of 21

In consideration and exchange for this Settlement, the Plaintiffs agree to release the Defendant for all wage and hour claims through December 20, 2021.

Each Plaintiff has been informed, in writing, of the methodology for assigning points, the value of a point, and the number of points calculated for them using the Defendant's payroll data. Each Plaintiff has been given an opportunity to dispute the number of points assigned and to review the point assignments and settlement awards of all other Plaintiffs. There have been no unresolved disputes or objections. The reaction of the collective has been nothing but positive.

## III.    Applicable Factors for Approving FLSA Settlements

A settlement in an FLSA collective action is not effective unless it is approved by either a district court or the United States Department of Labor. *Fisher v. SD Prot. Inc.*, 948 F.3d 593, 599-600 (2d Cir. 2020); *Cheeks v. Freeport Pancake House, Inc.,* 796 F.3d 199, 206 (2d Cir. 2015). "As a result, district courts in this Circuit routinely review FLSA settlements for fairness before approving any stipulated dismissal." *Id.* "Generally, there is a strong presumption in favor of finding a settlement fair, because the Court is generally not in as good a position as the parties to determine the reasonableness of an FLSA settlement." *Lliguichuzhca v. Cinema 60, LLC*, 948 F. Supp. 2d 362, 365 (S.D.N.Y. 2013) (internal quotation marks omitted).

"In determining whether to approve proposed FLSA collective action settlements, courts are mindful of the fact that 'FLSA collective actions do not implicate the same due process concerns as Rule 23 actions.'" *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 476 (S.D.N.Y. 2013); *Willix v. Healthfirst, Inc.*, No. 07 Civ. 1143, 2011 WL 754862, at *5 (E.D.N.Y. 2011). Unlike Rule 23 class actions where failure to affirmatively opt-out results in a class member being bound by an approved class settlement, in an FLSA action like this one, an eligible individual who decides *not* to join is not a party to the case, and as such, is not bound in any way by the settlement agreement, or the final judgment in a case. As such, "[c]ourts approve FLSA settlements when they are reached as a result of contested litigation to resolve bona fide disputes.'" *Id.* (quoting *Beckman*, 293 F.R.D. at 476). "Typically, courts regard the adversarial nature of a litigated FLSA case to be an adequate indicator of the fairness of the settlement." *Beckman*, 293 F.R.D. at 476.

Courts evaluating whether FLSA settlements are reasonable consider the following factors:

(1) the plaintiffs' range of possible recovery;
(2) the extent to which the settlement will enable the parties to avoid anticipated burdens and expenses in establishing their respective claims and defenses;
(3) the seriousness of the litigation risks faced by the parties;
(4) whether the settlement is the product of arm's-length bargaining between experienced counsel; and
(5) the possibility of fraud or collusion.

*Wolinsky*, 900 F. Supp. 2d at 336; *Fisher*, 948 F.3d at 599-600 ("District courts typically evaluate the fairness of a settlement agreement by considering the factors outlined in *Wolinsky*…."). Importantly, under the Second Circuit's recent *Fisher* decision, "[w]hen presented with a settlement for approval, a district court's options are to (1) accept the proposed settlement; (2) reject the proposed settlement and delay proceedings to see if a different settlement can be achieved; or (3) proceed with litigation." *Fisher,* 948 F.3d at 606.

Judge Gardephe
Page 7 of 21

### a. Application of the *Wolinsky* Factors to the Settlement

As discussed below, the proposed Settlement is fair and reasonable to Plaintiffs and Defendant.

### i. Plaintiffs' Possible Range of Recovery

The Settlement results in a non-reversionary **$29,905,963.50** Net Settlement Fund for the 1,199 Plaintiffs. Plaintiffs believe the Net Settlement Fund, which is the amount to be distributed to the Plaintiffs after fees, expenses and Service Awards are deducted, is equal to 65.11% of Plaintiffs' total claimed damages using a full three-year recovery period and a full award of liquidated damages on their best day in court. McGillivary Decl., ¶ 15. The average net settlement amount to the 1,199 individual Plaintiffs is **$24,942.42**. *Id.*

Considering the risks associated with trying the remaining claims, and establishing collective-wide damages, this amount is certainly reasonable. *See Rojas v. Pizza Pete's LLC*, 2019 U.S. Dist. LEXIS 149717, 2019 WL 4447578, at *5 (net settlement of 36% of total alleged damages after deducting costs and counsels' 1/3 contingency fee is "clearly reasonable given the uncertainties inherent in any litigation"); *Chowdhury v. Brioni America, Inc.*, 2017 WL 5953171, at *2 (S.D.N.Y. 2017) (net settlement of 40% of FLSA plaintiffs' maximum recovery is reasonable); *Redwood v. Cassway Contracting Corp.*, 2017 WL 4764486, at *2 (S.D.N.Y. 2017) (net settlement of 29.1% of FLSA plaintiffs' maximum recovery is reasonable); *Felix v. Breakroom Burgers & Tacos*, 15 Civ. 3531, 2016 U.S. Dist. LEXIS 30050, 2016 WL 3791149 at *2 (S.D.N.Y. 2016) (net settlement of 25% of FLSA plaintiff's maximum recovery is reasonable).

The Gross Backpay and Liquidated Damages agreed to by the Defendant to resolve this case, before deducting attorneys' fees, expenses, and Service Awards, is $40,750,000.00 ("Gross Damages Amount"). McGillivary Decl. ¶ 16. The Defendant also agreed to pay hourly attorneys' fees in the amount of $1,972,805.00 and expenses in the amount of $177,195.00. McGillivary Decl., ¶ 13. These amounts were added to the $40,750,000.00 to arrive at the total settlement fund of $42,900,000.00.

The Gross Damages Amount (before the contingency fee and expenses were deducted consistent with Plaintiffs' agreements with counsel) is based on damages calculations prepared by Plaintiffs' expert damages witness, Dr. Louis Lanier, which were reviewed by Defendant's expert witness, Dr. Christopher Erath, as part of the Parties' arms-length negotiations. Plaintiffs believe that the Gross Damages Amount is equal to 88.94% of Plaintiffs' total claimed damages using a full three-year recovery period and a full award of liquidated damages on Plaintiffs' best day in court.

Notably, the Gross Damages Amount is based on a ***three-year statute of limitations*** on all claims (i.e., three years prior to the date each Plaintiff's consent-to-join form was filed in Court through December 20, 2021, or the Plaintiff's last date of employment in a covered title, whichever is earlier). Ex. 1, ¶ 2.5. To achieve this outcome at trial, Plaintiffs would have been required to prove that Defendant willfully violated the law; otherwise, a two-year statute of limitations would apply. 29 U.S.C. § 255 (a); *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).

Judge Gardephe
Page 8 of 21

The chart below demonstrates one way[4] of evaluating the value of the Gross Damages Amount on a claim-by-claim basis:

| Claim | Back Pay Damages | Liquidated Damages |
|---|---|---|
| Overtime Pay Rate Claim | $218,982 | $218,982 (100%) |
| Straight Time Claim | $440,355 | $440,355 (100%) |
| Late Payment of Overtime | | $975,443 (85%) |
| Pre- and Post-Shift Overtime Claim (up to 30 minutes per day) | $2,302,734 | $2,072,461 (90%) |
| Meal Period Claim (2 hours and 40 minutes per week for missed meals) | $19,373,559 | $14,707,129 (75.9%) |

A discussion of the Gross Damages Amount and the associated litigation risks with respect to each claim is set forth below.

*Full Relief on the Regular Rate and Straight Time Claims.* Plaintiffs were granted summary judgment on liability on the Regular Rate Claim and the Straight Time Claim. The jury was left to decide the amount of backpay owed as a result of these violations, as well as whether a three-year or two-year recovery period applied. The Court would have then determined whether liquidated damages were owed. On all three of these claims, the amounts listed above account for three years of full backpay damages, as well as a full award of liquidated damages equal to the backpay. The calculation of damages for these, and all other claims, was based on the Defendant's payroll and timekeeping data for all Plaintiffs.

*Late Payment of Overtime Claim.* On Plaintiffs' Late Payment of Overtime Claim, which would require Plaintiffs to prove at trial that Defendant, and not Plaintiffs, caused a delay in the payment for approved overtime work, the Settlement represents liquidated damages equaling 85% of the amount Plaintiffs sought to recover at trial. The damages associated with the Late Payment of Overtime Claim are liquidated damages to compensate Plaintiffs for the delayed, but eventual, payment for the overtime work. Accordingly, payment of $975,443 equals 85% of the maximum possible recovery on this claim. Plaintiffs faced risk at trial on this claim because it required the Plaintiffs to prove it was Defendant's actions, and not the Plaintiffs' (e.g., by failing to timely submit requests for overtime work), that resulted in delayed payment.

*Uncompensated Pre- and Post-Shift Overtime Claim.* Plaintiffs were granted summary judgment on liability on this claim, which left the jury to determine the amount of time Plaintiffs spent performing work before and/or after their paid shifts. The settlement amount associated with the Pre- and Post-Shift Overtime Claim was calculated based on the time recorded in the CityTime

---

[4] Since it is impossible to know what the jury would have ultimately awarded on each claim, there are multiple ways to view the damages. For example, another way of valuing the Gross Damages Amount on the Meal Period Claim is that it represents each Plaintiff working through 2 hours and 23 minutes of unpaid meal periods each week during every week of a three-year lookback recovery period, which would be valued at $17,367,929.00 in backpay, plus liquidated damages equal to 95% of that amount (i.e., $16,473,486), with all of the other values in the chart above for each claim remaining the same. This is another scenario that would be both a plausible and successful outcome for Plaintiffs at trial.

timekeeping system up to thirty minutes per day total. For example, if in a workweek a Plaintiff worked 40 hours or more **and** the Plaintiff's CityTime data reflected an additional 15 minutes of uncompensated time on all 5 days in that workweek, 75 minutes (15 minutes multiplied by 5 days) of backpay overtime damages were assigned for that workweek for this claim. If the CityTime data reflected that a Plaintiff worked an additional 30 minutes of uncompensated time on all 5 days in a workweek, 150 minutes (30 minutes multiplied by 5 days) of backpay overtime damages were assigned for that workweek for this claim. Additionally, the Settlement includes an amount equal to 90% of the backpay amount as liquidated damages on the Pre- and Post-Shift Overtime Claim. Plaintiffs faced risk at trial on this claim because Plaintiffs carry the burden of proving the amount of uncompensated overtime work performed.

***Meal Period Claim.*** Plaintiffs were granted summary judgment on liability on this claim, which left the jury to determine the amount of time Plaintiffs spent performing work during their unpaid meal periods. The Settlement represents full backpay on the Meal Period Claim for 2 hours and 40 minutes per week for each week of the recovery period for each Plaintiff or two full missed meals and one partially missed meal of 40 minutes. Additionally, the Settlement includes an amount equal to 76% of the backpay as liquidated damages on the Meal Period Claim. Plaintiffs faced risk on this claim because, at trial, Plaintiffs carry the burden of proving the amount of time they worked through their unpaid meal periods each workweek, and there was some variance in the testimony regarding the number of times per week Plaintiffs worked through all or a portion of what was supposed to be a one-hour duty-free meal period.

Moreover, for the Pre- and Post-Shift Overtime and Meal Period Claims, if Plaintiffs were successful in meeting their burden at trial, it is possible that a jury could have awarded fewer minutes per day of pre- or post-shift overtime, or fewer minutes per week in unpaid meal periods. Significantly, even if a jury ruled in Plaintiffs' favor, a jury may have found that these violations were not willful, resulting in a two-year rather than three-year recovery period, and it is possible that the Court may not have awarded liquidated damages.

In light of this range of recovery as compared to the amounts provided for under the Settlement Agreement, this Settlement represents an excellent result for the Plaintiffs on *all* claims.

### ii. Avoiding Anticipated Burdens and Expenses

Litigating FLSA claims and damages at trial would be a fact-intensive process demanding additional costly litigation for both Parties. Without this Settlement, both Parties would need to spend significant time and resources to prepare for a multi-week trial, including meeting with and preparing numerous Discovery Plaintiffs for trial testimony, preparing trial exhibits, preparing motions *in limine*, preparing pre-trial briefing, drafting jury instructions, voir dire, and a verdict form, preparing opening statements, presenting the case to a jury, preparing summation, presenting the issue of liquidated damages to the Court for a decision, likely post-trial motions practice, and possible appeal. In short, absent settlement, the anticipated burdens and expenses on both Parties were significant.

### iii. Seriousness of Litigation Risks

As noted above, there was risk to both sides regarding the jury's determinations of the

Judge Gardephe
Page 10 of 21

amount of uncompensated work performed on the claims that result in the most significant damages to the Plaintiffs: Plaintiffs' Pre- and Post-Shift Claim and Meal Period Claim, as well as the issues of whether the Defendant's violations on all claims were willful and lacked good faith or reasonableness. Given the uncertainty over the potential outcome, both Parties were motivated to settle this dispute.

### iv. Arm's-Length Bargaining

Both Parties engaged in good faith, arm's-length negotiation in reaching this Settlement. Counsel for the Parties negotiated settlement terms over the course of several months, until a tentative settlement was reached. Plaintiffs' expert witness analyzed detailed payroll information and timekeeping records and shared those calculations and all underlying programing with Defendant. Defendant's expert reviewed and analyzed Plaintiffs' damages calculations, and these calculations were relied upon by the Parties to negotiate the settlement amount.

Ultimately, the Parties reached an agreement in principle and the settlement terms were then approved by the Plaintiffs' Settlement Team. In addition, all Plaintiffs have been informed of the Settlement and its terms, and they have been informed of their opportunity, if they so choose, to object to the Settlement terms on an individual basis. In addition, they were informed of the Settlement distribution methodology and the point value. They had an opportunity to dispute the number of recovery period weeks assigned to them, and to review the amounts and weeks allocated to each and every Plaintiff, including the Service Awards. **No Plaintiff has lodged any objection to the Settlement.**

### v. Possibility of Fraud or Collusion

Given this hard-fought battle over the course of more than *seven years*, as well as the Parties' arms-length negotiating and their good faith participation in settlement discussions, there was no opportunity for fraud or collusion. The Parties represented their clients zealously and obtained what both Parties consider to be a fair and reasonable Settlement consistent with standards established in the Second Circuit for FLSA collective action settlements.

### b. The Service Awards to the Settlement Team and Discovery Plaintiffs are Appropriate[5]

Courts in this Circuit have recognized that, "[i]n FLSA collective actions, just as in Rule 23 class actions, service awards are important to compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by the plaintiff." *See, e.g., Sanz v. Johnny Utah 51 LLC*, 2015 WL 1808935 (S.D.N.Y. 2015) (quoting *Diaz v. Scores Holding Co., Inc.*, 2011 U.S. Dist. LEXIS 112187, 2011 WL 6399468 at *3-4 (S.D.N.Y. 2011)). This Court has regularly approved service awards to representative plaintiffs totaling up to 9.1% of the settlement amount. *See, e.g., Johnson v. Brennan,* 2011 WL 6399468, at *2, 21 (S.D.N.Y. 2011). *See also Yuzary v.*

---

[5] Defendant takes no position regarding the Service Awards provided to the Settlement Team and Discovery Plaintiffs as these Awards are made pursuant to agreements solely between Plaintiffs and their Counsel.

Judge Gardephe
Page 11 of 21

*HSBC Bank USA, N.A.,* 2013 U.S. Dist. LEXIS 144327, at \*32 (S.D.N.Y. Oct. 2, 2013) (Gardephe, J.) (approving $10,000 Service Awards to each of nine named plaintiffs in FLSA/Rule 23 hybrid settlement); *Martingao v. Merrill Lynch & Co.*, No. 11-cv-03923-PGG, 2013 U.S. Dist. LEXIS 205935, at \*27 (S.D.N.Y. Oct. 3, 2013) (approving Service Awards of $10,000, $8,500, $7,500, and $2,500 to participating plaintiffs in FLSA / Rule 23 hybrid settlement) (Gardephe, J.).

The Service Awards will be provided to the three Settlement Team members who also served as Discovery Plaintiffs, and 38 other Discovery Plaintiffs, all of whom served the class by participating in extensive discovery. McGillivary Decl., ¶¶ 6-7. In addition to the damages that all of the plaintiffs will receive pursuant to the points distribution methodology, each Settlement Team member will receive $5,000, for a total of $15,000 in service awards, and each Discovery Plaintiff will receive $1,500 for a total of $57,000 in service awards. Ex. 1, ¶ X. Therefore, the Service Awards **total $72,000.00** and are approximately one tenth of one percent (00.10%) of the **$42,900,000.00** Settlement Amount. All 1,199 Plaintiffs have been informed of these payments, and none have objected to the Service Awards. McGillivary Decl., ¶ 6.

The Settlement Team and 38 Discovery Plaintiffs spent time investigating and responding to written discovery requests, searching for documents, meeting with Plaintiffs' Counsel to discuss their claims, meeting with Plaintiffs' Counsel to prepare for depositions, and sitting for lengthy depositions, where they described the unpaid work they performed, and how their claims stem from Defendant's common policies and practices. They also engaged in telephone discussions with Plaintiffs' Counsel to prepare for trial. The time and effort exerted by Discovery Plaintiffs resulted in a significant benefit to the collective – namely, a decision in Plaintiffs' favor at summary judgment, and a decision that the Plaintiffs' case could be presented to the jury through representative testimony because the Discovery Plaintiffs were similarly situated to the other Plaintiffs. In addition, the Settlement Team invested additional time assisting Plaintiffs' Counsel in gathering facts for the initial Complaint, participating in the settlement discussions, reviewing damages calculations, assessing the various settlement scenarios and facilitating in recommending a settlement to the other Plaintiffs. McGillivary Decl., ¶ 7.

As this Court explained in approving service awards to plaintiffs involved in filing and litigating a similar claim, "in a wages and hours case, where a low-level employee assumes responsibility for prosecuting an action against an employer and takes considerable personal risk in so doing, such awards are singularly appropriate." *Henry*, 2014 U.S. Dist. LEXIS 72574, 2014 WL 2199427 at \*11. Service awards "fulfill the important purpose of compensating plaintiffs for the time they spend and the risks they take." *Flores v. Anjost Corp.*, 2014 WL 321831, at \*27 (S.D.N.Y. 2014). As such, service awards are common in the Second Circuit. *See, e.g.*, *Bryant v. Potbelly Sandwich Works, LLC*, 2020 WL 563804, at \*22 (S.D.N.Y. 2020) (approving service awards between $2,500 and $5,000 to participating plaintiffs); *Cruz v. Sal-Mark Rest. Corp.*, 2019 WL 355334 at \*21 (N.D.N.Y. 2019) (approving as reasonable $5,000 service award to plaintiff); *Sealock v. Covance, In*c., Civil Action No. 17-cv-5857 (JMF), 2020 U.S. Dist. LEXIS 44753, at \*11-12 (S.D.N.Y. 2020) (approving $10,000 service award to plaintiff).

Here, the Settlement Team and Discovery Plaintiffs assumed a risk in not only coming forward and suing their employer, but in actively engaging in the litigation and confronting their employer about its allegedly unlawful practices. They were each deposed and faced extensive questioning from experienced litigators from the law firm Jackson Lewis. McGillivary Decl., ¶ 7.

Judge Gardephe
Page 12 of 21

Their willingness to serve the collective as Settlement and Discovery Plaintiffs achieved favorable results for 1,158 additional Plaintiffs (e.g., median individual settlement amount is **24,942.42** *after* fees, expenses, and Service Awards are deducted). *Id.* Under well-established Second Circuit precedent, the Settlement Team and Discovery Plaintiffs are entitled to the Service Awards sought in this Settlement.

### c. Attorneys' Fees and Costs[6]

Each of the 1,199 Plaintiffs signed a written contract in which they agreed to a 30% contingency fee when they retained the law firms handling this case. McGillivary Decl., ¶ 12. Accordingly, under the Settlement, after expenses in the amount of $177,195.00 are reimbursed, Plaintiffs' Counsel will be paid $12,816,841.50, which represents a 30% contingency fee of the Settlement net of costs. *See Run Guo Zhang v. Lin Kumo Japanese Rest., Inc*., 2015 WL 5122530 at *1 (S.D. N.Y. 2015) ("The Court's view is that attorneys' fees, when awarded on a percentage basis, are to be awarded based on the settlement net of costs**.**").

### i. Percentage of the Fund Awards Are Favored and the Amount Sought in this Matter is Similar to Court-Approved Fees in Similar Percentage of the Fund Cases

The Second Circuit favors the use of the contingent percentage of the fund method to compensate attorneys in overtime wage and hour actions. *See, e.g., McDaniel v. County of Schenectady,* 595 F.3d 411, 417 (2d Cir. 2010); *Wal-Mart Stores, In. v. Visa U.S.A., Inc.* 396 F.3d 96 (2d Cir. 2005). The reasoning behind this is straightforward: "[T]he percentage method directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." *Monserrate v. Tequipment, Inc.*, 2012 WL 5830557 at *3 (E.D.N.Y. 2012). That "powerful incentive" is the very real possibility that plaintiffs' counsel will not recover any fees whatsoever. *Butt v. Megabus Ne. LLC*, 2012 U.S. Dist. LEXIS 137683 at *22 (S.D.N.Y. 2012) ("Class Counsel risked time and effort and advanced costs and expenses, with no ultimate guarantee of compensation. [Therefore, a] percentage-of-recovery fee award of 33.3% is consistent with the Second Circuit's decision").

"Attorneys who fill the private attorney general role must be adequately compensated for their efforts. If not, wage and hour abuses would go without remedy because attorneys would be unwilling to take on the risk. Adequate compensation for attorneys who protect wage and hour rights furthers the remedial purposes of the FLSA and NYLL." *Deleon*, 2015 U.S. Dist. LEXIS 65261, 2015 WL 2255394 at * 5 (FLSA and New York labor law claims) (citing *Goldberger v. Integrated Res. Inc.*, 209 F.3d 43, 51 (2d Cir. 2000), for "commending the general 'sentiment in favor of providing lawyers with sufficient incentive to bring common fund cases that serve the public interest.'"). *See Bozak v. FedEx Ground Package Sys.,* 2014 WL 3778211, at *16 (D. Conn.

---

[6] As described in the Settlement Agreement, each of the Plaintiffs has entered into individual agreements with Plaintiffs' Counsel that contain contingency fee provisions. The Defendant is not a party to these agreements. As such, Defendant takes no position regarding Section III(c) of this letter other than that Defendant agreed to pay hourly attorneys' fees in the amount of $1,972,805.00 and expenses in the amount of $177,195.00.

Judge Gardephe
Page 13 of 21

2014) ("Fee awards in wage and hour cases are meant to "encourage members of the bar to provide legal services to those whose wage claims might otherwise be too small to justify the retention of able, legal counsel."); *Capsolas v. Pasta Resources Inc.,* 2012 WL 4760910, at *8 (S.D.N.Y. 2012) (fee request of one-third is "consistent with the norms of class litigation in this circuit"). As such, evaluating the amount of fees provided for in a settlement agreement using the "percentage-of-recovery" method is consistent with the "trend in this Circuit. *Bannerman v. Air-Sea Packing Grp.*, 2020 WL 408350, at *3 (S.D.N.Y. 2020) (approving attorneys' fees of 33 1/3%).

## 1.  Private Fee Agreements Should be Honored

Consistent with the Second Circuit's disposition toward contingency fee agreements is its favorable position toward private fee agreements. By enforcing such agreements, the Court provides low income and individual plaintiffs with a powerful tool for enforcing their rights. As the Supreme Court has explained in the civil rights context, "[Nothing] in the legislative history … persuades us that Congress intended § 1988 to limit civil rights plaintiffs' freedom to contract with their attorneys." *Venegas v. Mitchell*, 495 U.S. 82, 87 (1990). This is because "depriving plaintiffs of the option of promising to pay more than the statutory fee if that is necessary to secure counsel of their choice would not further § 1988's general purpose of enabling such plaintiffs in civil rights cases to secure competent counsel." *Id.* at 89-90. Therefore, the fee-shifting provision of § 1988 "controls what the losing defendant must pay, not what the prevailing plaintiff must pay his lawyer." *Id.* at 90. The same holds true in the fee shifting context of the FLSA.[7]

Moreover, courts in this circuit recognize that where small claims can only be prosecuted through aggregate litigation, such as in the instant FLSA case, attorneys who fill the "private attorney general" role must be compensated for their efforts through enforceable contingent fee agreements. *See, e.g., Viafara v. MCIZ Corp.,* 2014 WL 1777438 at *27-28 (S.D.N.Y. 2014) (approving 33 1/3 % fee consistent with norms of fee shifting litigation in Second Circuit); *Zeltser v. Merrill Lynch & Co*., 2014 WL 4816134, at *9 (S.D.N.Y 2014) (same); *Sukhnandan v. Royal Health Care of Long Island LLC*, 2014 WL 3778173, at *4 (S.D.N.Y. 2014) (same); *Clem v. KeyBank, N.A.*, 2014 WL 2895918, at *10-11 (S.D.N.Y. 2014) (same). Indeed, many individual

---

[7] *See, e.g., Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, n.4 (2d Cir. 2007) (in ADEA case, which incorporates same fee-shifting provision as FLSA, Court concluded  that attorney and client should be able to settle distribution of the attorney's fees "according to their own contract terms, which are beyond the province of this Court."); *Samaroo v. Deluxe Delivery Sys*., 2016 U.S. Dist. LEXIS 34742, 2016 WL 1070346 at *9 n.4 (S.D.N.Y. 2016) (approving attorneys' fees and costs of more than 34% of the settlement noting that "I do not address the fee arrangement between plaintiffs and their counsel because I do not believe I am required to do so under *Cheeks*. As described in *Cheeks*, the purpose of the FLSA is to regulate the relationship between an employee and his employer and to protect the employee from over-reaching by the employer. I do not understand the FLSA to regulate the relationship between the employee as plaintiff and his counsel or to alter the freedom of contract between a client and his attorney."); *Chowdhury v. Brioni Am., Inc.,* 2017 U.S. Dist. LEXIS 196469, 2017 WL 5953171 at *15-16 (S.D.N.Y. Nov. 29, 2017) ("Finally, pursuant to a retainer agreement signed by plaintiffs, plaintiffs' counsel will receive one third of the settlement proceeds, exclusive of counsel's out-of-pocket costs, for contingency fees. Contingency fees of one-third in FLSA cases are routinely approved in this Circuit.").

Judge Gardephe
Page 14 of 21

litigants, including the Plaintiffs here, likely "cannot afford to retain counsel at fixed hourly rates
. . . yet they are willing to pay a portion of any recovery they may receive in return for successful
representation." *deMunecas v. Bold Food, LLC*, 2010 U.S. Dist. LEXIS 87644, 2010 WL 3322580
at *21-22 (S.D.N.Y. 2010) (quoting *In re Abrams*, 605 F.3d 238, 245-46 (4th Cir. 2010)).

Here, each of the 1,199 Plaintiffs entered into a private fee agreement to pay their "private
attorneys general" a 30% percent contingency fee.[8] The agreement provides:

> In consideration of the services of [McGillivary Steele Elkin LLP], and other such
> law firms with whom they deem necessary to work on my case such as Spivak
> Lipton, LLP of New York City, I agree to pay such attorneys 30% (thirty percent)
> of my total gross recovery (inclusive of attorneys' fees recovered from defendants)
> as attorneys' fees. In the event that [McGillivary Steele Elkin LLP & Spivak Lipton
> LLP] recovers attorneys' fees from the defendants in this action, and such fees
> equal or exceed the contingent fee, I will not be assessed any attorneys' fees. If the
> complaint brought on my behalf results in no recovery, I will have no obligation to
> pay attorneys' fees.

McGillivary Decl., Ex. B, at 2. Defendant agreed to pay $1,972,805.00 in attorneys' fees and
$177,195.00 in expenses, which does not exceed 30% of the total gross recovery (i.e.,
$12,816,841.50).

Additionally, there are no "absent" class members in this case. Instead, all 1,199 Plaintiffs
knew about the 30% contingent fee at the start of the case, signed a contract agreeing to pay it, and
have been informed about the amount they will now pay once the Court approves the settlement.
**No Plaintiff has objected to the fees or expenses.** For all of these reasons, this Court should
"enforce the parties' intentions in a contingent fee agreement, as with any contract." *Alderman v.
Pan Am World Airways*, 169 F.3d 99, 103 (2d Cir. 1999).

## 2. The Attorneys' Fees Sought in This Matter are in Line with Settlements of Similar Size, Complexity and Subject Matter

As courts in this circuit have repeatedly recognized, "When using a 'percentage of the
fund' approach, 'courts regularly approve attorney's fees of one-third of the settlement amount
in FLSA cases.'" *Xiao v. Grand Sichuan Intn'l St. Marks, Inc.*, 2016 U.S. Dist. LEXIS 99669,
2016 WL 4074444 at *3 (S.D.N.Y. Jul. 29, 2016) (citing *Meza v. 317 Amsterdam Corp.*, 2015 U.S.
Dist. LEXIS 166890, 2015 WL 9161791 (S.D.N.Y. Dec. 14, 2015)). *See Bryant v. Potbelly
Sandwich Works, LLC*, 2020 U.S. Dist. LEXIS 21900, 2019 WL 1915298, at *15 (S.D.N.Y. Feb.
4, 2020) (in FLSA/Rule 23 hybrid, approving one-third of common settlement fund as "reasonable
and well within the accepted range awarded in wage and hour cases in this District and throughout
the Second Circuit"); *Cruz v. Sal-Mark Rest. Corp.*, 2019 U.S. Dist. LEXIS 13529, 2019 WL
355334 at *21 (N.D.N.Y. Jan. 28, 2019) (approving one-third fee, noting that a "presumptively
reasonable fee takes into account what a reasonable, paying client would pay" and this "supports

---

[8] A copy of the contingency fee agreement signed by Plaintiff Keisha Foster (with Personally
Identifiable Information redacted) is attached to the Declaration of Gregory K. McGillivary as
Exhibit C. This is the same agreement each of the 1,199 Plaintiffs signed.

Judge Gardephe
Page 15 of 21

a one-third (33.33%) recovery in a case like this one where Class Counsel's fee entitlement is entirely contingent upon success"); *Chung v. Brooke's Homecare LLC,* 2018 WL 2186413, at *3-4 (S.D.N.Y. 2018) (awarding one-third fee, noting that "Courts routinely award 33.33% of a settlement fund as a reasonable fee in FLSA cases"); *Penafiel v. Babad Mgmt. Co., LLC,* 2018 U.S. Dist. LEXIS 66991, 2018 WL 1918613 at *9 (S.D.N.Y. Apr. 18, 2018) (awarding 33.3% fee, noting "Contingency fees of one-third in FLSA cases are routinely approved in this Circuit").

Not only is the contingent fee of 30% sought in this matter: (1) ***lower*** than the norm of one-third typically awarded in this Circuit, (2) consistent with fees in wage and hour cases in this Circuit, and (3) what each of the Plaintiffs agreed to pay at the outset of this litigation, but the attorneys' fees requested here are also in line with other settlements of a similar size, complexity and subject matter. Here, after deducting attorneys' fees and expenses, the Plaintiffs are recouping ***65.11% of their total possible recovery in light of the amounts they would have sought at trial if they were fully successful on all issues*** (and after which they would be responsible for paying a contingent fee too). *See e.g., Davis v. J.P. Morgan Chase & Co*., 827 F. Supp. 2d 172, 178, 185-86 (W.D.N.Y. 2011) (awarding $14 million dollars in attorneys' fees, representing one-third of $42 million settlement fund in a Rule 23/FLSA hybrid involving "thousands of class members"); *Worley v. City of New York,* 17-cv-04337-LGS, Dkt. 230 (S.D.N.Y. Jun. 8, 2020) (approving one-third contingency fee of $9,197,682.07 in FLSA collective action from settlement totaling $27,747,075.22 where the average net settlement amount to the 3,880 Plaintiffs was $4,726.38); *Yuzary v. HSBC Bank USA, N.A.*, 2013 U.S. Dist. LEXIS 144327, at *24 (S.D.N.Y. Oct. 2, 2013) (Gardephe, J.) (approving requested attorney's fee of $4,953,125, representing 31.7% of the settlement fund of $15,625,000 in FLSA/Rule 23 hybrid settlement); *Hart v. RCI Hosp. Holdings*, 2015 U.S. Dist. LEXIS 126934, 2015 WL 557713 at *5, *11, *44 (S.D.N.Y. 2015) (approving requested attorneys' fee of $4,928,949.74 representing 32.9% of the gross settlement amount of $15 million in 2,208-member FLSA/Rule 23 hybrid reversionary settlement where the average payment assuming full participation of the class was $4,255).

"[T]he most critical factor in determining the reasonableness of a fee award is the degree of success obtained." *Fisher,* 948 F.3d at 606 (quoting *Farrar v. Hobby*, 506 U.S. 103, 114, 113 S. Ct. 566, 121 L. Ed. 2d 494 (1992)) (internal quotation marks omitted). Indeed, as these cases make clear, the contingent fee percentage being paid by the Plaintiffs is ***less*** than contingent fees paid in cases of similar size, and the average net award after the contingent fee is paid of more than $24,900 per Plaintiff is more than those recovered in cases of similar size. In short, the result for Plaintiffs is outstanding.

### 3. As the Second Circuit Recently Explained, the Negotiated Terms of an FLSA Settlement Agreement Cannot Be Modified

In *Fisher v. SD Prot. Inc*., 948 F.3d 593, 605 (2d Cir. 2020), the Second Circuit clarified that there is no cap on the amount of attorneys' fees to be recovered in an FLSA settlement, and held that a district court abuses its discretion by rewriting and reallocating funds, including attorneys' fees, under a settlement agreement negotiated between the parties.

In *Fisher*, the district court approved the settlement amount as fair under *Cheeks*, but then proceeded to modify the allocation of the settlement funds as between the plaintiff and the defendant, imposing a one-third percentage cap on attorneys' fees. The Second Circuit held that such a cap is contrary to the FLSA because "in advancing Congress's goals under the FLSA to

Judge Gardephe
Page 16 of 21

ensure a 'fair day's pay for a fair day's work,' the law cannot be read to impose a proportional limitation based on the perceived complexities of the litigation." *Fisher*, 948 F.3d at 603. As such, the Court held that "in light of the text and purpose of the FLSA, as well as longstanding case law interpreting other similar fee-shifting statutes in the civil rights context, we conclude that the district court erred in imposing a proportionality limit on [plaintiff's counsel's] recoverable attorneys' fees." *Id.* at 605.

The Court further held that "a district court may not simply rewrite the terms of a settlement agreement because a 'settlement agreement is a contract that is interpreted according to general principles of contract law.'" *Id.* at 605. "If the 'terms of a contract are clear, courts must take care not to alter or go beyond the express terms of the agreement, or to impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself.'" *Id.* (*quoting Lilly v. City of New York*, 934 F.3d 222, 235 (2d Cir. 2019)). Thus, "[w]hen presented with a settlement for approval, a district court's options are to (1) accept the proposed settlement; (2) reject the proposed settlement and delay proceedings to see if a different settlement can be achieved; or (3) proceed with litigation." *Id.* at 606. The Court emphasized that "even though a district court has a duty to review an FLSA settlement for reasonableness to prevent any potential abuse, this does not grant the court authority to rewrite contract provisions it finds objectionable." *Id.* at 606.

Here, the Settlement provides:

Plaintiffs have entered into individual agreements with Plaintiffs' Counsel. These agreements provide for a contingency attorney fee amount equal to thirty percent (30%) of the Settlement Amount calculated after expenses in the amount of $177,195.00 are deducted from the Settlement Amount. Plaintiffs and their counsel are solely responsible for determining the contingency attorney fee applicable to this Agreement. Plaintiffs' Counsel shall deduct their contingency attorney fee in the amount of $12,816,841.50 from the Lump Sum Amount in accordance with Plaintiffs' individual agreements with Plaintiffs' Counsel.

Ex. 1, ¶ 2.4. In *Fisher*, the settlement agreement was silent as to how the payment was to be divided between plaintiff and his counsel and the Second Circuit still ruled the lower court abused its discretion in rewriting the settlement agreement. Here, the Settlement Agreement explicitly describes Plaintiffs' Counsel's agreement with their clients, and any reallocation of the Settlement Funds would ignore the plain language of the Settlement. Thus, under *Fisher*, any redistribution of settlement funds would interfere with the 1,199 contracts between Plaintiffs and their Counsel. Moreover, the Settlement provides an excellent recovery for the Plaintiffs and approval of the Settlement, in its entirety, will provide these 1,199 essential workers who protect New York City's children with settlement proceeds in the median amount of $24,942.42, **after** fees and expenses are deducted (McGillivary Decl., ¶ 15), within 90 days of Court approval. As described above, all Plaintiffs individually agreed to the 30% contingency fee at the outset of the litigation[9] - an amount

---

[9] When considering the reasonableness of fees, the district court should consider "the consequent risk of non-payment viewed *as of the time of filing the suit*." *Henry v. Little Mint, Inc.*, 2014 U.S. Dist. LEXIS 72574, 2014 WL 2199427 at *43 (S.D.N.Y. 2014) (emphasis added). *See Sewell v. Bovis Lend Lease LMB, Inc.*, 2012 WL 1320124 at *37-38 (S.D.N.Y. 2012); *Johnson*, 2011 U.S.

Judge Gardephe
Page 17 of 21

that, as described above, is **lower** than the typical one-third contingency fee approved by this Circuit - and have been notified of how that agreed upon fee has been applied to the Settlement. **Not a single Plaintiff has objected to that fee as part of the overall Settlement Agreement reached by the parties.** McGillivary Decl., ¶¶ 4-5. Accordingly, the Court should find that the Settlement, inclusive of the 30% contingency fee, is a fair and reasonable resolution of this case.

### ii. The Fee is Reasonable Based on "Traditional Criteria"

In determining a reasonable award of attorneys' fees, this Court will also consider the "traditional criteria" such as "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement and (6) public policy considerations. *Goldberger*, 208 F. 3d 43, 50 (2d Cir. 2000) (internal quotations omitted). An analysis of these criteria further supports the fee requested, in addition to Plaintiffs' individual contingency fee agreements with Plaintiffs' counsel as described above.

### 1. The Litigation was Complex

"The size and difficulty of the issues in a case are significant factors to be considered in making a fee award." *Sukhnandan v. Royal Health Care of Long Island LLC*, 2014 U.S. Dist. LEXIS 105596, 2014 WL 3778173 at *10 (S.D.N.Y. 2014). Here, given the size of the collective, and the sophistication of the employer and its policies, the Defendant's claimed defenses, and the sheer volume of work involved in litigating this matter over seven years, this case did not represent a straightforward FLSA claim where a single employee seeks compensation for an easily defined amount of unpaid work. It involved nearly 1,200 Plaintiffs, working across five boroughs for the City's Administration for Children's Services. As a result, this litigation was complex, and Plaintiffs' Counsels' expertise greatly benefitted the 1,199 plaintiffs.

To start, the case involved a thorough investigation by Plaintiffs' Counsel to determine the extent of the violations. McGillivary Decl., ¶ 10; Pordy Decl., ¶¶ 2, 14

Following Defendant's Answer, the Parties began negotiating a stipulation on discovery to be obtained from a subset of Plaintiffs. McGillivary Decl., ¶ 10. Once formal discovery began, the process was time consuming and multifaceted. McGillivary Decl., ¶ 10; Pordy Decl., ¶ 14. Defendant took written discovery from the Discovery Plaintiffs, seeking numerous documents and propounding extensive interrogatories. *Id.* Additionally, Defendant deposed 41 Discovery Plaintiffs in this matter. *Id.* Plaintiffs' Counsel met with each of these 41 Discovery Plaintiffs to explain the deposition process and defend their depositions. *Id.* Plaintiffs' Counsel also deposed five of Defendant's FRCP 30(b)(6) witnesses on 48 topics related to the Plaintiffs' job duties, Defendant's policies regarding unpaid meal periods, Defendant' policies on timekeeping and payroll, Defendant's alleged efforts towards FLSA compliance, Defendant's alleged efforts to train the Plaintiffs on the FLSA and overtime, and Defendant's claim that the CPSS were FLSA exempt. *Id.* Plaintiffs also deposed two management witnesses in the title of Child Protective Manager. *Id.*

---

Dist. LEXIS 105775, 2011 WL 4357376 at *58. In other words, a court should credit counsel for bearing the risk of litigation prior to any guarantee of success.

While discovery was ongoing, Defendant moved to disqualify Plaintiffs' Counsel, which required extensive and detailed briefing. Dkt. 87-92; McGillivary Decl., ¶ 10.; Pordy Decl., ¶ 14.

Following discovery, Plaintiffs' Counsel combed through the voluminous records produced during discovery, along with the deposition testimony, to present a successful motion for summary judgment. After the Court ruled in Plaintiffs' favor on that motion, Defendant moved to certify an interlocutory appeal which was ultimately unsuccessful. Dkt. 180.

Additionally, Plaintiffs presented a detailed trial plan, and later, once again distilled the voluminous record to demonstrate that common policies existed which would allow for a representative trial on the various claims at issue in this case. *Id.* After the Magistrate Judge's ruling finding that Plaintiffs were similarly situated, the Court ultimately adopted that finding over Defendant's objections. Dkt. 225.

Given that there were 1,199 Plaintiffs with a recovery period spanning more than ten years, the Parties engaged expert witnesses to compile and analyze millions of lines of pay and hours work data, with the Plaintiffs' expert witness layering over mathematical formulas to determine the damages owed in this case. McGillivary Decl., ¶ 10; Pordy Decl., ¶ 14. Plaintiffs' damages expert witness prepared a report, backed up by computer data and programming, which was reviewed and critiqued by Defendant's expert witness, and both witnesses were deposed. *Id.*

Finally, while the similarly situated ruling would permit the trial to proceed using representative testimony, there remained several complex questions left for the jury to decide including: 1) how many minutes per week Plaintiffs spend performing uncompensated pre- and post-shift overtime; 2) how many minutes per week Plaintiffs spend performing uncompensated overtime during unpaid meal periods; 3) the damages resulting from the Pre- and Post-Shift Claim; 4) the damages resulting from the Meal-Period Claim; 5) the damages resulting from the Regular Rate Claim; 6) the damages resulting from the Straight Time Claim; 7) whether Defendant's actions caused the delayed payment of overtime; 8) if so, the damages resulting from the delayed payment of overtime; and 9) whether Defendant willfully violated the FLSA. These questions would require Plaintiffs to proffer significant proof at trial to meet their burden on each of those claims. Thereafter, there would have been further briefing on the issue of whether Defendant is liable for liquidated damages.

Taken together, the magnitude of Plaintiffs' claims and the posture of this litigation was complex and required significant effort and expertise by Plaintiffs' Counsel to advance Plaintiffs' claims and reach a favorable outcome.

## 2. The Time and Labor Required Was Extensive

Significant time and labor were spent by Plaintiffs' Counsel in reaching the settlement.[10] McGillivary Decl., ¶ 10; Pordy Decl., ¶ 14. During more than seven years spent litigating this

[10] Attached as Exhibit A to the Declaration of Gregory K. McGillivary (Exhibit 3 to this letter) are the fee and expense listings for services performed by McGillivary Steele Elkin LLP. Attached as Exhibit A to the Declaration of Hope A. Pordy (Exhibit 4 to this letter) are the fee and expense listings for services performed by Spivak Lipton LLP.

lawsuit, Plaintiffs' Counsel have not been paid for any of the work that they have performed. This uncompensated work has been substantial and includes: 1) interviewing Plaintiffs and investigating claims; 2) preparing and filing the Complaint, the Amended Complaint, and the Second Amended Complaint; 3) attending court conferences; 4) opposing the Defendant's Motion to Disqualify counsel; 5) negotiating a discovery plan with Defendant; 6) preparing written discovery to Defendant; 7) analyzing written discovery requests and conferring with 41 Discovery Plaintiffs to respond to same; 8) working with Discovery Plaintiffs to compile documents in response to Defendant's requests; 9) meeting with 41 Discovery Plaintiffs to prepare for depositions; 10) defending 41 Plaintiff depositions; 11) filing a Motion to Compel documents related to Defendant's good-faith defense; 12) noticing Rule 30(b)(6) depositions on 48 sub-topics; 13) preparing for Rule 30(b)(6) depositions; 14) taking Rule 30(b)(6) depositions; 15) taking management witness depositions; 16) engaging an expert witness to prepare damages calculations by analyzing millions of lines of data; 17) analyzing the report of Defendant's expert witness; 18) taking and defending expert witnesses' depositions; 19) drafting the summary judgment briefing and opposition and preparing supporting documents; 20) drafting an Opposition to Defendant's attempt to certify an interlocutory appeal; 21) drafting an extensive proposed trial plan; 22) drafting the similarly situated briefing; 23) drafting a response to the Defendant's objections to the Magistrate Judge's similarly situated Report and Recommendation; 24) preparing for trial, including notifying Discovery Plaintiffs of trial, calls with Discovery Plaintiffs about trial testimony, and analyzing the voluminous record to prepare for trial; 25) preparing a settlement demand; 26) conferences with the Settlement Team; 27) engaging in extensive settlement discussions; 28) negotiating the written terms of the Settlement Agreement; 29) notifying 1,199 Plaintiffs of the terms of the Settlement Agreement; 30) responding to questions regarding the Settlement; 31) preparing Settlement approval papers; and 32) preparing for administration of the Settlement. McGillivary Decl., ¶ 10; Pordy Decl., ¶ 14.

### 3. The Fee in Relation to the Settlement Fund is Reasonable

The cases cited in Section III.b.i confirm the reasonableness of the requested fee, as it is consistent with other FLSA cases in this Circuit. As demonstrated in Section III.b.ii.7 below, the fee represents a lodestar multiplier of 5.51, which is within the range approved by courts in this Circuit.

In this case, each of the 1,199 individual Plaintiffs determined that the fair market rate for Plaintiffs' Counsel was 30% of the funds recovered, and thus awarding attorneys' fees consisting of that amount is warranted.

### 4. The Risk of Litigation

Plaintiffs' Counsel undertook to prosecute this action without any guarantee of payment and litigated on a contingent basis for *seven years* and advanced all the expenses of the litigation. Plaintiffs' Counsel was required to make a significant investment of time and resources without a guarantee of payment of any kind. The success of such off-the-clock/unpaid work time cases on a class wide basis involving 1,199 employees would have been hard fought at trial by Defendant, and Defendant would have attempted to move for judgment as a matter of law and/or to decertify the collective at trial. Appeals would have surely followed. Accordingly, Plaintiffs' Counsel faced significant obstacles to recovery for the entire class on all claims absent settlement.

Judge Gardephe
Page 20 of 21

### 5.  The Quality of Representation

As described fully in the Declarations of Gregory K. McGillivary and Hope Pordy, Plaintiffs' Counsel are nationally recognized experts in the FLSA and wage and hour law, and their expertise greatly benefited the Plaintiffs. For example, Mr. McGillivary has litigated hundreds of FLSA cases and is the author of the government chapter in the treatise "The Fair Labor Standards Act," E. Kearns, and Plaintiffs benefited from this level of expertise. McGillivary Decl., ¶¶ 17-21. *See also* McGillivary Decl., ¶¶ 13-33; Pordy Decl., ¶¶ 3-12, 19.

### 6.  Public Policy Weighs in Favor of Approving the Fee

As described above, the risk in this case was high and the work performed by Plaintiffs' Counsel significant. Plaintiffs' case was hardly "run of the mill," in that Plaintiffs presented claims based on common policies and practices justifying representative treatment at trial. Dkt. 225. In doing so, as this Court noted, Plaintiffs proceeding collectively with the assistance of counsel "furthers the goal of collective actions recognized by the Second Circuit, because it permits employees earning modest wages to efficiently vindicate their rights by the pooling of resources." *Id.*, at 11. Plaintiffs respectfully submit that this collective treatment advances the broad remedial public policy purposes of the FLSA.

### 7.  A Lodestar Cross-Check Supports the Fees Requested

The lodestar multiplier is calculated by dividing the fee award by the lodestar (the reasonable hours billed multiplied by a reasonable hourly rate). *James v. China Grill Mgmt.*, 2019 U.S. Dist. LEXIS 72759, 2019 WL 1915298 at *8 (S.D.N.Y. 2019). "Where the lodestar method is used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court. Instead, the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case." *Bryant v. Potbelly Sandwich Works, LLC*, 2019 WL 1915298, at *19 (S.D.N.Y. 2020). Here, in light of the individual agreements with Plaintiffs' Counsel signed by each of the 1,199 Plaintiffs providing for a 30% contingent fee, and expressly incorporated into the Settlement Agreement, the Court may find on that basis, alone, that the negotiated Agreement sufficiently establishes the reasonableness of the fee. *See* discussion supra Section III.c.i.1. Nevertheless, a lodestar cross-check will further demonstrate that the Settlement is fair and reasonable based on approved fee awards within the Second Circuit.

Multiplying the hourly rates here by the hours of work performed results in a lodestar of $2,326,032.00. McGillivary Decl., Ex. A; Pordy Decl., Ex. A. Thus, Plaintiffs' Counsel's 30% contingent fee agreement with the Plaintiffs results in a lodestar multiplier of 5.51.

"Courts regularly award lodestar multipliers of up to eight times lodestar, and in some cases, even higher multipliers." *Martignago v. Merrill Lynch & Co.*, No. 11-cv-03923-PGG, 2013 U.S. Dist. LEXIS 205935, at *25-26 (S.D.N.Y. Oct. 3, 2013) (Gardephe, J.); *Yuzary v. HSBC Bank USA, N.A.*, 2013 U.S. Dist. LEXIS 144327, at *29 (S.D.N.Y. Oct. 2, 2013) (Gardephe, J.) (awarding lodestar multiplier of approximately 7.6 and noting that it "falls within the range granted by courts"); *Bryant v. Potbelly Sandwich Works, LLC*, 2020 WL 563804, at *19 (S.D.N.Y. 2020) (multiplier of two to six is common and higher lodestars often awarded); *Ramirez v. Lovin' Oven Catering Suffolk, Inc.*, No. 11 Civ. 520, 2012 U.S. Dist. LEXIS 25060, 2012 WL 651640, at *4 (S.D.N.Y. Feb. 24, 2012) (granting attorneys' fees equal to 6.8 times lodestar); *Davis v. J.P.*

Judge Gardephe
Page 21 of 21

*Morgan Chase & Co.*, 827 F. Supp. 2d 172, 184-86 (W.D.N.Y. 2011) (awarding multiplier of 5.3 in wage and hour class action); *Beckman,* 293 F.R.D. at 481; *In re RJR Nabisco, Inc. Sec. Litig.,* No. 88 Civ. 7905, 1992 WL 210138, at *5 (S.D.N.Y. Aug. 24, 1992) (awarding multiplier of 6); *Cosgrove v. Sullivan,* 759 F. Supp. 166, 167 n. 1 (S.D.N.Y. 1991) (awarding multiplier of 8.74).

Where a lodestar cross-check is applied, courts consider "whether a multiplier is warranted based on factors such as (1) the contingent nature of the expected compensation for services rendered; (2) the consequent risk of non-payment viewed as of the time of filing the suit; (3) the quality of representation; and (4) the results achieved." *Henry,* 2014 U.S. Dist. LEXIS 72574, 2014 WL 2199427 at *43-44; *In re Boesky Secs. Litig.*, 888 F. Supp. 551, 562 (S.D.N.Y. 1995); *see also Goldberger,* 209 F.3d at 4.

As set forth in Section b.ii.1, Plaintiffs' Counsel zealously and skillfully litigated this collective action with no guarantee of success and in response to the Defendant's vigorous defense. Under these circumstances, a 5.51 multiplier of the lodestar is appropriate.

### d.  Approval of Plaintiffs' Counsels' Expenses is Warranted

In this litigation, Plaintiffs' Counsel has incurred $177,195.00 in out-of-pocket expenses. A detailed breakdown of the expenses incurred by McGillivary Steele Elkin LLP is attached to the Declaration of Gregory McGillivary as Exhibit A. A detailed breakdown of the expenses incurred by Spivak Lipton LLP is attached to the Declaration of Hope Pordy as Exhibit A. Counsel are entitled to reimbursement of litigation expenses from the Settlement fund. 29 U.S.C § 216(b). Plaintiffs' Counsels' expenses, including experts, copying, electronic research, travel and printing, were reasonable and necessary to counsel's representation of Plaintiffs. *McGreevy v. Life Alert Emergency Response, Inc.*, 258 F. Supp. 3d 380, 390 (S.D.N.Y. 2017) (awarding expenses for experts, copying, electronic research, travel and printing, and other out-of-pocket expenses).

### IV.  Conclusion

For all of the above reasons, the Parties believe that this Settlement is a favorable outcome and will appropriately compensate Plaintiffs for the overtime pay issues that are the subject matter of this litigation. Accordingly, the Parties respectfully submit that the Settlement, in its entirety, is fair and reasonable and should be approved by the Court.

Sincerely,

MCGILLIVARY STEELE ELKIN LLP

/s/ Gregory K. McGillivary
Gregory K. McGillivary

cc: All Counsel of Record (vis ECF)